**ARCA AIRLINES, LTDA., Plaintiff,**

v.

**UNITED STATES CUSTOMS SERVICE, Harry W. Carnes, District Director of Customs, in his individual capacity, and Harvey Fox, Director of Regula-**

tions and Rulings, United States Customs Service, in his individual capacity, Defendants.

**ARCA AIRLINES, LTDA., Plaintiff,**

v.

**UNITED STATES CUSTOMS SERVICE, and Harry W. Carnes, District Director of Customs, in his individual capacity, Defendants.**

Nos. 87–2050–CIV, 88–0430–CIV.

United States District Court, S.D. Florida.

Oct. 10, 1989.

Jeanne Mullenhoff, Lynn Summers, Asst. U.S. Attys., for defendants.

Peter Herrick, Miami, Fla., for plaintiff.

## MEMORANDUM OPINION

SCOTT, District Judge.

These consolidated cases arise from the failure of an international airline to prevent the use of its aircraft to smuggle narcotics into the United States. ARCA Airlines, Ltda. ("ARCA") contests the assessment of penalties by the United States Customs Service ("Customs") under 19 U.S.C. § 1584(a)(2). Customs imposed the penalties after discovering cocaine on board two ARCA aircraft flown from Bogota, Colombia to Miami, Florida.

While the setting is familiar, the role of common carriers in the war against drugs is a novel issue. The Court will first present the background of the dispute before turning to this intriguing issue.

## I. BACKGROUND

### A. *The Air–Carrier Initiative Agreement*

ARCA Airlines, Ltda. ("ARCA") is an international air carrier based in Colombia. ARCA transports cut flowers and other cargo from Bogota, Colombia to Miami, Florida, and is therefore an obvious target for drug traffickers. In fact, the United States Customs Service ("Customs") has seized narcotics from ARCA aircraft on numerous occasions.

With each seizure, ARCA is subject to the assessment of penalties under 19 U.S.C. § 1584(a)(2). Customs recognized the need for ARCA's cooperation in preventing the use of ARCA aircraft to smuggle narcotics into the United States. For these reasons, on September 27, 1984, ARCA and Customs executed an Air Carrier Initiative Agreement.

Under the Agreement, ARCA was required to take measures to ensure the security of its aircraft and airport facilities in Miami and Bogota. ARCA agreed to secure its cargo facilities, restrict cargo access to ARCA employees, and detect weight discrepancies in cargo destined for Miami. In return, Customs promised to consider ARCA's efforts in determining whether to assess penalties in the event of future seizures.

### B. *The First Seizure*

On May 21, 1985, a Customs survey team travelled to Bogota to conduct a security inspection of El Dorado Airport at the request of the Colombian government. Customs found a chaotic scene at ARCA's airport facilities. Flowers destined for South Florida arrived on open trucks, cars and taxis, and were packed into pallets and loaded at cargo receiving areas by the truckers delivering them. The receiving areas were congested and unsupervised. Although ARCA ultimately verified the number of boxes, ARCA made no effort to verify their contents, even by weighing the individual boxes.

Based on the findings of the survey team, Customs suggested that all air carriers at El Dorado Airport undertake security measures to prevent the use of their aircraft to smuggle narcotics. Customs suggested that the carriers restrict access to the cargo receiving areas and aircraft so that only the carrier's employees would handle, weigh and count the cargo. In addition, Customs suggested that the carriers use trained narcotic detector dogs to search and screen all cargo.

On July 24, 1985, Customs conducted a routine inspection of cargo arriving at Miami International Airport on board ARCA Flight 112 from Bogota. While probing one of the boxes of flowers, the inspectors discovered a white powdery substance, which tested positive for cocaine. The number "264" appeared on the exterior of the box in highly visible red ink.

Customs decided to permit a controlled delivery of the cargo. Employees of Southern Rainbow, the consignee, unloaded the boxes into a van in full view of ARCA employees. The Southern Rainbow employees complained about the unusual weight of five boxes marked "264," and had considerable trouble carrying them.

Customs followed the van to Southern Rainbow's warehouse in an effort to identify the ultimate recipient of the cocaine. At midnight, however, Customs abandoned this plan and seized the boxes from the warehouse. Each of the five boxes marked "264" was filled with cocaine hidden beneath a layer of flowers and dry ice. The five boxes weighed about ninety pounds each. The remaining fifty-six boxes weighed about forty pounds each.

### C. *The First Penalty Assessment*

The morning after the seizure, Customs detained the aircraft and issued a notice of penalty pursuant to 19 U.S.C. § 1584. The amount of the penalty was $360,000, representing $50 per ounce of an estimated 450 pounds of cocaine. Subsequently, Customs determined that the actual weight of the cocaine was 384.5 pounds. Accordingly, the penalty was reduced to $307,600.

ARCA immediately initiated negotiations with Customs for the release of the aircraft. Customs agreed to release the aircraft in exchange for a promissory note for the amount of the penalty. The note was unconditionally due and payable thirty days after a final decision on ARCA's petition for remission or mitigation, pursuant to 19 U.S.C. § 1618.

ARCA submitted a petition to Customs requesting total remission of the penalty. In response, Customs mitigated the penalty by fifty percent, to $153,800. ARCA then submitted supplemental and amended supplemental petitions for further mitigation. On September 3, 1987, Customs denied these petitions and demanded payment by close of business on October 2, 1987.

At ARCA's request, Customs extended the payment deadline to October 13, 1987. However, on November 4, 1987, ARCA informed Customs that it did not intend to honor the promissory note or pay the mitigated penalty. ARCA offered to post a letter of credit or bond, and suggested that Customs initiate a penalty collection action in the Court of International Trade. Customs informed ARCA that if payment was not received that day, Customs would detain the aircraft to secure payment. When no payment was forthcoming, Customs detained the aircraft the following day. In response, ARCA filed the first of these consolidated actions. Subsequently, ARCA delivered a cashier's check for $153,800, and Customs released the aircraft.

### D. *The Second Seizure*

Customs conducted a second inspection of El Dorado Airport in February 1986. This time, ARCA consented to a complete inspection of its facilities. Tedoro Viera, ARCA's Station Manager, told Customs that he was not even aware of the Air Carrier Initiative Agreement. Viera informed Customs that ARCA did check sections of the aircraft and seal certain compartments. However, ARCA had not implemented any new security measures since the first inspection.

Customs also learned that ARCA workers received a mere $3.00 (500 Colombian pesos) per flight. The employees were not entitled to extra compensation for discovering contraband or reporting suspicious incidents. Furthermore, ARCA did not employ permanent guards. The ramp workers doubled as guards, even though no ARCA employee was subject to a background investigation.

The president of ARCA, Hernando Guttierez, Sr., explained that, in his view, the best way to prevent narcotics smuggling was to pay his employees for information

about *drug-dealing* activities at the airport, and pass along this information to the DEA. Guttierez admitted that his employees were easily corrupted by the money to be made in cocaine trafficking. He explained that he relied on certain employees to report on others. Finally, Guttierez stated that, on occasion, he had denounced local Colombian officials as corrupt. In his opinion, these actions were all that could be expected of ARCA.

However, Customs determined that while other airlines at El Dorado Airport had noticeably improved security procedures since the first survey, ARCA was now one of the highest risk carriers from Colombia. Accordingly, on March 21, 1986, Customs suspended the Air Carrier Inititative Agreement. ARCA approached Customs and promised to improve security. Notwithstanding ARCA's history of broken promises, Customs reinstated the Agreement.

History was to repeat itself, however. On September 14, 1986, ARCA Flight 112 from Bogota arrived at Miami International Airport. During the course of another routine inspection, Customs discovered approximately 74 pounds of cocaine hidden inside one box of an eighty box shipment of flowers. Customs again permitted a controlled delivery, this time leading to the arrest of the recipient, Edgar L. Hurtarte.

Customs notified ARCA that a penalty in the amount of $59,200 would be assessed. Customs held the aircraft as security and issued a written notice of penalty. ARCA commenced negotiations to release the aircraft and mitigate or remit the penalty. On September 16, 1986, Customs reduced the penalty by fifty percent, to $29,600. ARCA deposited the check, and Customs released the aircraft.

ARCA submitted a petition for further mitigation or remission. Customs denied the petition on the grounds that ARCA had failed to "exercise the highest degree of care and due diligence." Customs also denied ARCA's request for an extension of time to prepare a supplemental petition. Thereafter, ARCA filed the second of these consolidated actions against Customs.

## II. LEGAL ANALYSIS

### A. *Judicial Review of Mitigation Decisions*

ARCA seeks recovery of the penalties from Customs by way of equitable restitution or a writ of mandamus. Customs contends that the penalty assessment and mitigation decisions are not subject to judicial review on the merits.

In both of these consolidated cases, when confronted with the notice of penalty, ARCA executed an unconditional promissory note for the full amount of the penalty, and petitioned Customs for mitigation or remission. In exchange, Customs permitted ARCA to resume commercial use of the aircraft without posting a bond. Moreover, Customs considered ARCA's petitions and reduced the penalties by fifty percent. After reaping the benefits of the bargain, ARCA renounced the agreement.

Under these circumstances, judicial review is not available. Mitigation and remission decisions are committed to the discretion of the executive. A district court may only require Customs to exercise its discretion and consider a petition for mitigation or remission. The court cannot review the merits of the decision that Customs has reached in the exercise of its discretion. *See One 1977 Volvo 242 DL v. United States,* 650 F.2d 660 (5th Cir. Unit B 1981); *United States v. One 1973 Buick Riviera Automobile,* 560 F.2d 897 (8th Cir. 1977); *United States v. One 1970 Buick Riviera,* 463 F.2d 1168, 1170 (5th Cir.1971). As one court explained:

> The purpose of the remission statutes was to grant executive power to relieve against the harshness of forfeitures. The exercise of the power, however, was committed to the discretion of the executive so that he could temper justice with mercy or leniency. Remitting the forfeiture, however, constituted an act of grace. The Courts have not been granted jurisdiction to control the action of the executive, even where it is alleged, as here, in general conclusory language, that discretion has been abused.

*United States v. One 1961 Cadillac,* 337 F.2d 730, 733 (6th Cir.1964).

If ARCA truly believed that the penalties were erroneously assessed, ARCA could have refused to pay Customs. Customs would have been forced to file a penalty collection action pursuant to 28 U.S.C. § 1355. By way of defense, ARCA could then have challenged the validity of the penalties. Instead, ARCA chose to pursue mitigation. Having made its election of remedies, ARCA is now precluded from contesting the penalties.

### B. *Due Process*

ARCA further contends that Customs violated ARCA's right of procedural due process by failing to issue a prepenalty notice pursuant to the statute. ARCA claims that Customs should have afforded ARCA an opportunity to be heard on the penalty assessment decision before actually assessing penalties against ARCA.

Even if Customs should have issued a prepenalty notice, this technical error simply does not rise to the level of a due process violation. Given the history of its relations with Customs, ARCA fully understood the statutory framework. Moreover, ARCA received actual notice of the penalty assessment. With the advice of counsel, ARCA elected to petition for mitigation or remission rather than defending a penalty collection action. As a result, Customs mitigated the penalties by fifty percent. Accordingly, we conclude that ARCA received all the process that was due. *See Griekspoor v. United States,* 433 F.Supp. 794, 798 (M.D.Fla.1977).

Moreover, ARCA was not prejudiced by Customs' failure to issue a prepenalty notice, because ARCA could not possibly have avoided the assessment of penalties. A common carrier is not subject to the assessment of penalties

if it appears to the satisfaction of the court that neither the master nor any of the officers (including licensed and unlicensed officers and petty officers) nor the owner of the vessel knew, and could not, by the highest degree of care and

diligence, have known, that such narcotic drugs were on board.

19 U.S.C. § 1584. Thus, a common carrier must exercise the highest degree of care to prevent the use of its aircraft to smuggle narcotics. Under this standard, a common carrier who fails to take affirmative measures to discover narcotics on board the aircraft cannot escape liability for the resulting penalties. *Lancashire Shipping Co. v. United States,* 17 F.Supp. 573 (S.D. N.Y.1936).

ARCA failed to take any measures to detect contraband in either of the flower shipments ultimately seized by Customs. ARCA should have packaged the cargo, rather than permitting the local truckers to do so. In addition, ARCA should have supervised the consignee taking the cargo from the warehouse. Finally, ARCA should have weighed the boxes. Any of these simple measures would have sufficed, because ARCA would have detected the weight discrepancy and halted the shipment. Moreover, all three measures were required by the terms of the Air Carrier Initiative Agreement.

ARCA was an obvious target for drug traffickers. Customs warned ARCA of its vulnerability. Yet ARCA continued to ignore conditions that were conducive to narcotics smuggling via ARCA aircraft. ARCA contends that it could not have been expected to take any security measures because of the danger posed by drug traffickers in Colombia. On the contrary, the Court finds that these circumstances put ARCA on notice of the high risk of narcotics smuggling at El Dorado Airport.

By way of defense, ARCA argues that it cannot afford to implement security measures. However, ARCA has chosen to complete in the high risk market of carriage from Bogota to Miami. Security measures are part of the cost of doing business. We do not find the cost excessive in view of the risk.

Moreover, the Court observes that ARCA has narrowly avoided an amendment to the statute increasing the amount of the penalty from $50 to $1000 per ounce of cocaine. 19 U.S.C. § 1584(a)(2). Con-

gress has determined that tough economic sanctions are necessary to force the transportation industry to do its part to stem the flow of illegal narcotics into the United States. Common carriers are not exempt unless they exercise the highest standard of care. Accordingly, ARCA's economic defense must fail.

## III. CONCLUSION

The Court concludes that the mitigation decisions are not subject to judicial review on the merits. Nor do we perceive any error of constitutional magnitude in Customs' failure to issue a prepenalty notice to ARCA.

Moreover, any error by Customs was harmless because ARCA could not have escaped liability for the penalties. Under the statute, ARCA was required to exercise the highest degree of care and diligence to discover narcotics aboard the aircraft. Despite repeated warnings, ARCA failed to take any measures to improve security. Yet Customs mitigated both penalties by fifty percent. Considering the history of narcotics smuggling on board ARCA aircraft, the Court might not have been so generous.

ARCA has provided no valid grounds for equitable restitution or a writ of mandamus compelling repayment of the penalties. Accordingly, judgment in favor of the United States Customs Service and against ARCA Airlines, Ltda. in both consolidated cases will be entered by separate order.

DONE and ORDERED.