# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-1730

_____

June Brown

*Plaintiff - Appellant*

v.

City of Jacksonville; Paul Mushrush; Cheryl Erkel

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: October 3, 2012
Filed: March 29, 2013

_____

Before RILEY, Chief Judge, LOKEN and BENTON, Circuit Judges.

_____

RILEY, Chief Judge.

The City of Jacksonville, Arkansas (City), terminated June Brown's employment for "Failure in Performance of Duties" and "Failure in Personal Conduct." On November 10, 2010, Brown sued the City and her supervisors, Paul Mushrush and Cheryl Erkel, claiming the City's reasons for terminating her employment were pretextual. Brown's suit raised seven claims: (1) age

discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq.; (2) gender discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e-2000e–17[1]; (3) disability discrimination in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.; (4) retaliation for taking protected leave in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq.; (5) interference with protected rights in violation of the FMLA; (6) retaliation in violation of Title VII; and (7) retaliation in violation of the Arkansas Civil Rights Act of 1993 (ACRA), Ark. Code Ann. §§ 16–123–101-108. The district court[2] granted the City and supervisors' motion for summary judgment on all of Brown's claims. Brown, having abandoned her gender discrimination claim, appeals. Because there is no evidence or reasonable inference that the City's reasons for terminating Brown's employment were pretextual, and having appellate jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND[3]
### A.    Facts

The City hired Brown in 1998 as a purchasing agent and promoted her in 1999 to purchasing manager. On June 9, 2009, the City terminated Brown's employment. Throughout Brown's employment, Paul Mushrush, the City's director of finance, was her supervisor. From December of 2007 until Brown ceased working for the City, Cheryl Erkel, the City's assistant finance director, also had supervisory authority over Brown.

---

[1]The district court inferred this claim from Brown's pleadings.

[2]The Honorable James M. Moody, United States District Judge for the Eastern District of Arkansas.

[3]We recite the facts in the light most favorable to Brown because she was the non-moving party. See, e.g., Young v. Allstate Ins. Co., 685 F.3d 782, 783 (8th Cir. 2012).

Viewed in the light most favorable to Brown, the facts are as follows. Before August 9, 2008, Brown suffered from hip problems that caused chronic pain and required her to walk with a cane. Between October 2006 and March 2007, Mushrush, who is older than Brown, referred to her as an "old woman" on several occasions and said each of the following once: "Hey old woman, we moving slow," "such an old woman, can't even straighten up," and "Hey, Crip [sic]."[4] Brown filed a charge of discrimination with the United States Equal Employment Opportunity Commission (EEOC) on May 24, 2007, which the EEOC dismissed on May 8, 2008.

On November 11, 2007, Mushrush instructed Brown to work only from 8 a.m. to 5 p.m. as part of a "process change" designed to solve persistent delays in paying vendors. Beginning as early as 2004, Brown had repeatedly informed Mushrush that she worked "at least 50-60 hours a week." Brown maintains she could not perform her job without working late. Mushrush testified "the job could be done in a 40-hour week, and [Brown] was not willing to cooperate or use the resources offered." On January 3, 2008, Mushrush observed Brown in her office past 5:30 p.m. He asked her why she was still in the office. "[J]ust trying to do my job," Brown says she replied. According to Brown, she was actually chatting with a coworker and making a personal phone call. She left at 5:36 p.m. after Mushrush instructed her to do so. On January 11, 2008, Mushrush completed an "employee counseling form" regarding the incident, in which he noted her actions "constitute[d] insubordination . . . by first defying [his] direct orders and second by not making use of the department[']s resources to complete tasks."

_____

[4]The only evidence Mushrush made these disability related statements is Brown's testimony. Mushrush contests Brown's account, testifying that the only time he referred to her disability was when he saw Brown, without her cane, resting her hands against a table in the hall and said, "It looks like you're moving slow. Do you need help?" Although Brown can point to no testimony corroborating her account, and other City employees testified Mushrush was "respectful towards everyone" and never made discriminatory comments to Brown, we do not make credibility determinations on a motion for summary judgment.

On August 9, 2008, Brown began a period of FMLA leave, during which she had hip replacement surgery. Her final day of FMLA leave was October 18, 2008. There is *no* evidence in the record indicating that Brown remained physically impaired or that anyone perceived her to be physically impaired after she returned from leave.

Before her FMLA leave, Brown had used a peculiar filing system which, according to undisputed evidence from other department employees, made it difficult for anyone except Brown to locate documents. While Brown was on leave, Erkel—who had previously advised Brown to reorganize her files to make them more accessible to the rest of the office—and Angela Blacklock, Brown's subordinate, handled Brown's responsibilities. When Brown returned to work, she learned that Erkel had reorganized, alphabetized, and centralized the purchasing department's files.

On April 8, 2009, Erkel issued Brown a formal "employee counseling form" for failure to perform her duties as purchasing manager. On many prior occasions, both Mushrush and Erkel informally explained to Brown that her performance was unsatisfactory. Brown responded by filing an internal EEOC complaint with the City, alleging Mushrush and Erkel were retaliating against her for filing the May 2007 EEOC charge. Two EEOC officers for the City conducted an investigation, recorded and transcribed by a court reporter, and informed Brown they "found no evidence or witness to support [her] belief that [she was] the subject of retaliation due to [her] filing of a previous complaint in 2007 with the [EEOC]." On the contrary, the investigation revealed numerous employees in the finance department, including Brown's subordinate Blacklock, who considered Brown to be a negative presence in the workplace. Blacklock said during the investigation that her workplace was "very stressful" because "[a]nything [Brown] [wa]s going through . . . affect[ed] the whole office, especially [Blacklock] since [Blacklock] work[ed] . . . close[ly] with [Brown]."

Blacklock also said she believed Brown was handling only 25% of the City's purchasing work while Blacklock did 75% of the work. Blacklock suggested the City's purchasing work was performed well and with "less stress" while Brown was on leave, although the department hired no one to cover for Brown. Another finance department employee, Debbie Jernigan, reported everyone in their workplace "kind of walk[ed] on pins and needles when it c[a]me[] to [Brown]." Jernigan also complained about Brown's "attitude and . . . her non-responsiveness to a lot of things that she should be doing in the office," explaining she and other employees had "dealt with it for quite a while."

On May 21, 2009, based on concerns that Brown's behavior was creating a hostile workplace for Blacklock and other employees in the finance department, the City's human resources director, Jill Ross, and Erkel launched an internal investigation. During the internal investigation, Brown acknowledged asking Blacklock and another employee, Linda Dupree, to provide information about the investigation. On May 26, 2009, Brown filed a second EEOC discrimination charge against the City. On June 8, 2009, Ross and Erkel completed their internal investigation and issued a report. The report concluded Brown had created a "hostile work environment" and had "acted in a manner so [as] to intimidate and harass her employee [(i.e., Blacklock)] and another . . . employee [(i.e., Dupree)] regarding [the] investigation." On June 9, 2009, Mushrush terminated Brown's employment for "Failure in Performance of Duties" and "Failure in Personal Conduct." On August 17, 2010, the EEOC dismissed Brown's second discrimination charge.

### B.    District Court Proceedings

After spending "many hours" reviewing Brown's bewildering brief in opposition to summary judgment, the district court granted the City and supervisors' motion for summary judgment on all of Brown's claims. First, the district court found that Brown failed to identify any evidence the City's reason for terminating her was a pretext for age discrimination. Second, the district court dismissed as time

barred Brown's claim that Erkel's promotion to assistant finance director represented age-based discrimination against Brown, because Brown failed to file EEOC charges within 300 days of the promotion. Third, the district court dismissed Brown's gender discrimination claim because she failed to make a prima facie case. Fourth, the district court rejected Brown's disability discrimination claim for two alternate reasons: (1) she failed to make a prima facie case because she offered no evidence as to her disability after the surgery, and (2) there was no "genuine dispute" the City's reasons for terminating her employment were pretextual. Fifth, the district court dismissed her FMLA claims because she failed to make a prima facie case of retaliation. Sixth, the district court dismissed her Title VII and ACRA retaliation claims because there was no evidence the City's "legitimate, non-discriminatory reasons" for terminating Brown were pretextual. Brown appeals.

## II. DISCUSSION

On this appeal from entry of summary judgment, we review de novo the district court's factual findings and legal conclusions, "giving Brown the benefit of all reasonable inferences." Brown v. Kan. City Freightliner Sales, Inc., 617 F.3d 995, 997 (8th Cir. 2010). We affirm a grant of summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

Because Brown's brief, filled as it is with unsupported legal and factual assertions, sometimes borders on incomprehensible, the precise issues she is raising in this appeal are unclear. Like the district court, we struggle to decipher seemingly inconsistent claims, and we have interpreted Brown's counsel's pages of arguments as favorably as the record allows.[5] From our reading, we infer Brown has abandoned

---

[5]We echo the district court's notice to Brown's counsel that we are "not inclined to undertake this effort again in his cases." See Rodgers v. City of Des Moines, 435 F.3d 904, 908 (8th Cir. 2006) ("[W]e will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments."); United

her Title VII gender discrimination claim, see Chay-Velasquez v. Ashcroft, 367 F.3d 751, 756 (8th Cir. 2004) (holding a claim is waived when "there [i]s no meaningful argument on th[e] claim in [the] opening brief"), and continues to press her Title VII retaliation claim and ADA, ADEA, FMLA, and ACRA claims on appeal. We address each statutory claim in turn.

## A. ADA

Although Brown's brief contains no citation to the relevant statute, we infer she bases her disability-discrimination claim on a purported violation of the ADA's prohibition of employment discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The district court concluded Brown failed to make a prima facie case for a violation of § 12112(a). Brown argues she presented sufficient evidence to permit a reasonable jury to find the City and supervisors violated the ADA. We disagree.

---

States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs."); cf. Gilbert v. Des Moines Area Com. Coll., 495 F.3d 906, 915 (8th Cir. 2007) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." (internal quotation omitted)). Not only is the opening appellate brief submitted by Brown's counsel littered with irrelevant sentences, careless prose, and rambling multi-page paragraphs, but Brown's counsel did not submit a reply brief—a decision which, even *if* tactical, underestimated the persuasiveness of the appellees' arguments.

### 1. Post-Amendment ADA Standard

In order to obtain relief under the ADA, as amended in 2008,[6] a plaintiff must show (1) she is a "qualified individual" under the ADA, (2) she suffered "discriminat[ion]" as the term is defined by the ADA, and (3) the "discriminat[ion]" was "bas[ed]" on "disability" as defined by the ADA. Id. Congress's 2008 amendments to the ADA did not fundamentally change the qualification requirement although they excised the term "with a disability" from the subsection defining a "qualified individual." See § 5(c)(1), 122 Stat. at 3557. To qualify under the post-amendment ADA, an individual must still be able to "perform the essential functions of the employment position" "with or without reasonable accommodation." 42 U.S.C. § 12111(8). Neither did the 2008 amendments significantly alter the subsection defining "discriminat[ion]." See § 5(a)(2), 122 Stat. at 3557. As before, "discriminat[ion]" under the ADA means an "adverse employment action." See, e.g., Benson v. Nw. Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995); see 42 U.S.C. § 12112(b). The 2008 amendments did alter the ADA definition of "disability." See § 4, 122 Stat. at 3555-56.

Relevant to this case, the 2008 amendments made clear the ADA applies to a person who "has been subjected to [adverse employment] action . . . under [the ADA] because of an actual *or perceived* physical or mental impairment *whether or not* the impairment limits *or is perceived to limit* a major life activity." 42 U.S.C. § 12102(3)(A) (emphasis added). The district court improperly analyzed Brown's ADA claim under the more restrictive requirements applicable to pre-amendment

---

[6]Congress's 2008 amendments to the ADA, which took effect on January 1, 2009, do not apply retroactively. See ADA Amendments Act of 2008, Pub. L. No. 110–325, § 8, 122 Stat. 3553, 3559 (2008); Nyrop v. Indep. Sch. Dist. No. 11, 616 F.3d 728, 734 n.4 (8th Cir. 2010). Although Brown's evidence of disability dates to 2008, we evaluate her ADA claim under the more generous post-amendment version of the ADA because the City's alleged violation of the ADA—termination of Brown's employment—occurred after the 2008 amendments took effect.

ADA claims.[7] The district court relied on the precise pre-amendment regulations defining the term "substantially limits"—cited by us in a pre-amendment case[8]—that Congress expressly rejected in 2008. See § 2(a)(8), 122 Stat. 3554. The district court, which focused on whether Brown had an actual impairment at the time her employment ended, also failed to consider whether Brown made a submissible claim under the post-amendment ADA's expanded definitions of perceived and historical impairment. Cf. 42 U.S.C. § 12102(1)(B)-(C), 12102(3). In our discussion hereafter we assume, without deciding, Brown was a qualified individual with a disability under the ADA, as amended.

### 2. Brown's Evidence

Despite the district court's error, our independent review leads us to uphold the district court's grant of summary judgment because Brown failed to make a prima facie case even if we assume she was disabled under the post-amendment ADA.[9] See, e.g., Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999) ("We may uphold a grant of summary judgment for any reason supported by the record, even if different from the reasons given by the district court.").

---

[7]We recognize that at least one of our cases also did not reference the appropriate version of the ADA. See, e.g., Kallail v. Alliant Energy Corporate Servs., Inc., 691 F.3d 925, 930 (8th Cir. 2012) (quoting the post-amendment version of 42 U.S.C. § 12112(a) in a case involving pre-2009 adverse employment action). Thus, the district court's reliance on pre-amendment ADA standards, though incorrect, is understandable.

[8]See Maziarka v. Mills Fleet Farm, Inc., 245 F.3d 675, 679 (8th Cir. 2001) (citing 29 C.F.R. § 1630.2(j)(1)(i)-(ii) (2000)).

[9]Our independent review of the record also leads us to reject Brown's contention that the City and supervisors did not properly raise—in the district court—her failure to state a prima facie case. The City and supervisors' brief in support of their motion for summary judgment plainly argued Brown "fail[ed] to establish a *prima facie* case of disability discrimination."

Brown's ADA claim cannot survive summary judgment because there is no evidence the City and supervisors terminated her employment "on the basis of disability." Id. § 12112(a). Congress's 2008 amendment to the ADA did not relieve Brown of the need to present direct or indirect evidence showing a causal link between the adverse employment action and her disability. Cf. Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004).

As direct evidence, Brown apparently points to the derogatory comments Mushrush allegedly made between fall 2006 and spring 2007. That evidence is stale vis-à-vis the adverse employment action, which occurred more than two years later. The time lag also prevents Mushrush's comments from serving as indirect evidence. In an analogous context, we held a two-month lag "dilute[d] any inference of causation." Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002); see also McBurney v. Stew Hansen's Dodge City, Inc., 398 F.3d 998, 1003 (8th Cir. 2005) (determining the six month gap diluted the causal link). Whatever maximum amount of time can pass without destroying an inference of causation, two years is far too long under the circumstances of Brown's case.

Although we assume Brown established "disability" under the post-amendment ADA, the record does not contain evidence sufficient to permit a reasonable jury to find the City terminated Brown based on any disability. Summary judgment was appropriate on Brown's ADA claim.

### B. ADEA

The ADEA makes it "unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623. To support her age discrimination claim under the ADEA, Brown apparently relies on the same comments by Mushrush on which she based her ADA claim. The district court found no genuine dispute of fact because there was no evidence Brown lost her job for pretextual reasons. We agree.

There is no evidence the City's stated reasons for terminating Brown's employment were pretexts for age discrimination. See Rahlf v. Mo-Tech Corp., 642 F.3d 633, 637 (8th Cir. 2011) ("At all times, the plaintiff retains the burden of persuasion to prove that age was the 'but-for' cause of termination."). At oral argument, Brown's counsel agreed Mushrush's age-related comments were not direct evidence of age-related discrimination. It is equally undisputed the City hired Brown when she was over forty years old. See Fitzgerald v. Action, Inc., 521 F.3d 867, 877 (8th Cir. 2008) ("We have noted it is unlikely a supervisor would hire an older employee and then discriminate on the basis of age, and such evidence creates a presumption against discrimination."). After Brown's termination, she also was not replaced with a younger worker—she was not replaced at all.

Brown repeatedly informed Mushrush (who was older than she) that she could not perform her job within a forty-hour workweek as expected by the City, and she also inappropriately pressured her subordinate and a coworker to divulge confidential details about the April 2009 EEOC investigation. The undisputed fact is Brown's work, which she insisted required more than forty hours per week to complete, was performed—not just adequately, but *more* effectively and quickly—by the finance department during Brown's absence, without hiring a replacement. Once Brown's duplicative, non-alphabetical filing system was organized and alphabetized, the finance department discovered paying bills was not the monumental task Brown portrayed it to be. In such circumstances, no reasonable jury could find the City's stated reasons were pretextual.

The district court correctly granted summary judgment on Brown's ADEA claim.

## C. FMLA

We have recognized three types of claims arising under two subsections of the FMLA dealing with prohibited acts, 29 U.S.C. § 2615(a)(1), (a)(2):

> (1) "entitlement" claims, see Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1005 (8th Cir. 2012), or "interference" claims, arising under § 2615(a)(1);

> (2) "retaliation" claims, arising under § 2615(a)(2), see Pulczinski, 691 F.3d at 1005-06; Lovland v. Emp'rs Mut. Cas. Co., 674 F.3d 806, 811 (8th Cir. 2012); and

> (3) "discrimination" claims, arising under § 2615(a)(1), see Pulczinski, 691 F.3d at 1006; cf. Lovland, 674 F.3d at 811.

Brown does not argue the City prevented her from taking FMLA leave. Thus, she has no "entitlement" claim. See Pulczinski, 691 F.3d at 1005. Her brief, instead, styles her FMLA claim as one for "retaliation." Brown argues the City and supervisors took adverse employment action against her because she exercised her right to take FMLA leave. Whether characterized as a "discrimination" claim under § 2615(a)(1), see id. at 1006 (describing a discrimination claim as one "aris[ing] when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA"), or as a "retaliation" claim under § 2615(a)(2), see Lovland, 674 F.3d at 811 (explaining that "retaliation" claims arise under the "'discrimination' prohibition of § 2615(a)(2)"), we require proof of the employer's discriminatory intent. See Pulczinski, 691 F.3d at 1007; accord Lovland, 674 F.3d at 811-13. This proof may come from direct evidence or indirect evidence using the McDonnell Douglas burden-shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-06 (1973). Although the district court did not have the benefit of our decisions in Pulczinski and Lovland when it granted summary

-12-

judgment on Brown's FMLA claim, we agree with the district court's underlying analysis.

The record does not contain evidence sufficient to establish a prima facie case for discrimination in violation of the FMLA, see 29 U.S.C. § 2615(a); 29 C.F.R. § 825.220(c), under either the direct evidence or McDonnell Douglas indirect evidence standards. Brown has no direct evidence the City "was motivated by [her] exercise of FMLA rights when it took [any] adverse actions," Pulczinski, 691 F.3d at 1007 (citing Hite v. Vermeer Mfg. Co., 446 F.3d 858, 865 (8th Cir. 2006)). In the absence of direct evidence, we apply the Title VII "McDonnell Douglas burden-shifting framework," Phillips v. Mathews, 547 F.3d 905, 912 (8th Cir. 2008), to FMLA discrimination claims. See Pulczinski, 691 F.3d at 1007 (citing Wierman v. Casey's Gen. Stores, 638 F.3d 984, 999 (8th Cir. 2011)).

Brown has failed to state a prima facie case for FMLA discrimination under the McDonnell Douglas standard because there is no evidence "a causal connection existed between the employee's action and the adverse employment action," id. (citing Quinn v. St. Louis Cnty., 653 F.3d 745, 754 (8th Cir. 2011)). On the contrary, all the evidence indicates Brown's use of FMLA leave did *not* "play[] a part" in the City's termination decision. Hite, 446 F.3d at 865 (quoting Kipp, 280 F.3d at 897). First, the significant length of time—eight months—between Brown's return from FMLA leave and her employment termination "diluted any inference of causation such that the temporal connection could not justify a causal link as a matter of law." McBurney, 398 F.3d at 1003 (8th Cir. 2005) (citing Smith v. Allen Health Sys., 302 F.3d 827, 833 (8th Cir. 2002)) (concluding six months is too long); see also Sisk v. Picture People, Inc., 669 F.3d 896, 900-01 (8th Cir. 2012) (deciding "[m]ore than two months is too long . . . without something more"); Smith v. Fairview Ridges Hosp., 625 F.3d 1076, 1088 (8th Cir. 2010) (determining "approximately one month," without more evidence of causation, is too long) abrogated on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031, 1043, 1058 app. (8th Cir. 2011).

-13-

Second, the undisputed evidence shows the City and supervisors communicated with Brown about her unsatisfactory job performance before she took FMLA leave. And other employees, including Blacklock, considered Brown to be a negative presence in their workplace before Brown took FMLA leave. This record does not support a prima facie case of FMLA discrimination. See, e.g., Sisk, 669 F.3d at 900-01. Even if it did, summary judgment would remain appropriate because—as we explained in our analysis of Brown's ADEA claim—Brown cannot show the City's stated reasons for terminating her employment were pretexts for FMLA discrimination. See, e.g., Pulczinski, 691 F.3d at 1007.

The district court properly granted summary judgment on Brown's FMLA claim.

## D.    Retaliation Under Title VII and the ACRA

Finally, Brown presses inexact "retaliation" claims against the City and supervisors. At oral argument, we reminded Brown's counsel that employment retaliation claims are not free-floating causes of action arising from the ether, and we pressed him to ground Brown's retaliation claims in a provision of the United States Code. Brown's counsel pointed to the ADA and ADEA. That was plainly incorrect. Brown claims the City and supervisors retaliated against her because she filed an EEOC complaint in April 2009. Her retaliation claims, therefore, are based on Title VII, 42 U.S.C. §§ 2000e-2000e–17, and the ACRA, Ark. Code Ann. §§ 16–123–101-108,[10] not on whatever statute might apply to the underlying conduct of which she complained. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 69 (2006) ("[T]he standard is tied to the challenged retaliatory act, not the underlying conduct

---

[10]Brown's second amended complaint lists three "retaliation" counts—one each against the City, Mushrush, and Erkel. In those counts, Brown alleges the City terminated her employment in retaliation for her filing of EEOC charges, which would be a violation of Title VII, and Brown demands compensatory damages under the ACRA.

that forms the basis of the Title VII complaint."). The district court correctly treated Brown's non-FMLA retaliation claims as arising under Title VII and the ACRA, and we agree with the district court's conclusion.

We evaluate Title VII and ACRA retaliation claims under the same legal framework. See Barber v. C1 Truck Driver Training, LLC, 656 F.3d 782, 792 (8th Cir. 2011); see also Hill v. City of Pine Bluff, Ark., 696 F.3d 709, 715-16 (8th Cir. 2012) ("We see no basis for concluding that the Arkansas Court would now hold that White provides an inadequate standard for analyzing claims under both subparts of Ark. Code Ann. § 16–123–108."). Title VII makes it "unlawful . . . for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). To make a submissible case that the City and supervisors violated this statute, Brown must either present "direct evidence of discrimination *or* create an inference of it under the McDonnell Douglas burden-shifting framework." Young-Losee v. Graphic Packaging Int'l, Inc., 631 F.3d 909, 912 (8th Cir. 2011) (emphasis added). Brown has presented no direct evidence because nothing in the record shows "a specific link . . . sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct." Id. (citing White, 548 U.S. at 57, 68). Thus, we turn to the McDonnell Douglas analysis.

To make a prima facie case that the City and supervisors violated Title VII, Brown must present enough evidence to permit a reasonable jury to find "(1) she engaged in protected conduct; (2) she suffered materially adverse employment action, action that would deter a reasonable employee from making a charge of employment discrimination or harassment; and (3) the materially adverse action was causally linked to the protected conduct." Fercello v. Cnty. of Ramsey, 612 F.3d 1069, 1077-78 (8th Cir. 2010). If Brown meets this requirement, she would still lack a submissible case if the City and supervisors "articulate a legitimate, non-retaliatory

reason for the adverse action" and she cannot show that "reason is a pretext for retaliation." Macias Soto v. Core-Mark Int'l, Inc., 521 F.3d 837, 841 (8th Cir. 2008).

Brown has made a prima facie case. First, Brown engaged in two acts protected by Title VII. In early April 2009, Brown made an internal EEOC complaint with the City's EEOC officers, informing them of her intention to file an EEOC charge of discrimination. Then, on May 26, 2009, she filed a charge with the EEOC. Second, Brown's employment termination on June 9, 2009, would have been sufficiently adverse under our strict pre-White standard, see, e.g., Cross v. Cleaver, 142 F.3d 1059, 1073 (8th Cir. 1998), and is more than sufficiently adverse under White's relaxed test. See White, 548 U.S. at 68. Third, the record contains sufficient evidence of a causal link between Brown's protected activity and her materially adverse employment action. Erkel admitted in her deposition that the investigation which resulted from Brown's April 2009 EEOC complaint about "a hostile work environment . . . led to the investigation of whether or not June Brown was the actual cause of that hostile work environment." The City and supervisors admit Brown lost her job as a result of that second investigation. Although these two facts contain no specific evidence of motivation,[11] a reasonable jury could infer discrimination from this sequence of events.

Nonetheless, Brown's Title VII and ACRA claims do not pass muster under Federal Rule of Civil Procedure 56(a). The City and supervisors consistently have explained they terminated Brown's employment for two "legitimate, non-retaliatory reason[s]," Macias Soto, 521 F.3d at 841: (1) her work performance was

_____

[11]For this reason, these two facts are not—contrary to Brown's contention—*direct* evidence of discrimination. See, e.g., Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1046 (8th Cir. 2005) (requiring "direct evidence of conduct or statements by persons involved in the decision-making process, which indicate a discriminatory attitude was more likely than not a *motivating* factor in the employer's decision" (emphasis added)).

-16-

unacceptable, and (2) her behavior toward other employees created a hostile work environment. The evidence supporting the City's explanation is strong, and Brown has presented no evidence that these legitimate reasons were pretextual.

After Brown filed her internal EEOC complaint in early April 2009, two City EEOC officers conducted an investigation. They found no evidence Brown had been subjected to a hostile work environment, and they communicated this finding to Brown on April 27, 2009. During that investigation, they received complaints—notably from Blacklock—that Brown's volatile behavior toward Blacklock and other finance department staff was creating a hostile work environment for those employees. The two EEOC officers communicated those complaints to the City's human resources director, Jill Ross. Approximately a month later, based on the EEOC officers' report of complaints against Brown, Ross and Erkel began an internal investigation. Brown inappropriately pressured Blacklock and another employee to provide confidential information about this investigation. At the conclusion of their investigation, Ross and Erkel reported to Mushrush that Brown "harass[ed]" Blacklock, repeatedly pressuring her for confidential information, which caused Blacklock to "feel pressure and . . . distress [i]n her working conditions." The investigation also revealed most of Brown's colleagues were stressed by her personal conduct and frustrated by her inefficient work performance. Mushrush terminated Brown's employment only after receiving Ross and Erkel's report. There is no evidence showing the legitimate, non-discriminatory reasons outlined in the termination notice and Ross and Erkel's report were pretextual. Cf., e.g., Pulczinski, 691 F.3d at 1007.

Title VII is a shield to protect employees from retaliation for exercising their right to challenge discriminatory treatment by filing EEOC complaints and charges. It is not a cudgel to be wielded by underperforming and unprofessional employees to prevent justified, non-discriminatory employment termination. Presented with the evidence contained in the record, no reasonable jury could find Brown needs Title VII

to shield her against retaliation for engaging in protected activity. The district court properly granted summary judgment on Brown's Title VII and ACRA retaliation claims.

## III. CONCLUSION

After an independent review of the entire record, we affirm.

_____