# United States Court of Appeals

## For the Eighth Circuit

_____

No. 13-2830

_____

ASARCO, LLC

*Plaintiff - Appellant*

v.

Union Pacific Railroad Company, a Utah corporation

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: May 13, 2014
Filed: August 8, 2014

_____

Before RILEY, Chief Judge, BEAM and SMITH, Circuit Judges.

_____

RILEY, Chief Judge.

Two companies with a business relationship dating back to the nineteenth century call upon us to resolve their dispute about environmental liability for a lead refinery and smelter—once among the world's largest—which polluted Omaha, Nebraska, for over a hundred years. The former American Smelting and Refining Company, today known simply as ASARCO, LLC (Asarco), claims the Union Pacific

Railroad Company (UP) has contributed too small a share of the clean-up cost. Asarco paid approximately $200 million to settle with the Environmental Protection Agency (EPA), which named lead-contaminated areas of Omaha a "Superfund" site. UP settled with the EPA for $25 million.

Under the complex statutory structure erected by Congress in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA or Act), 42 U.S.C. §§ 9601-9675, settling with the government protects a party from further liability claims. See id. § 9613(f)(2). Despite receiving notice of UP's settlement, Asarco did not object before the district court[1] issued the consent decree. Asarco waited until after entry of the consent decree and brought this collateral case. According to Asarco, UP breached the two companies' agreement to toll the statute of limitations while "reserv[ing] all [other] rights and defenses." The district court[2] granted UP's motion to dismiss, ruling UP did not breach the agreement and the consent decree protected UP from Asarco's claims. Having duly considered Asarco's assignments of error, we affirm.

## I.    BACKGROUND

The history of this case is an archetypal tale of industrial boom and environmental bust.

### A.    The Smelter

About a year after the Golden Spike linked the coasts in 1869, the Omaha Smelting Company began construction on land leased from UP near the eastern terminus of the Transcontinental Railroad. See 1 Omaha: The Gate City and Douglas

---

[1]The Honorable Laurie Smith Camp, Chief Judge, United States District Court for the District of Nebraska.

[2]The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska.

County Nebraska 226 (Arthur C. Wakeley ed., 1917). Both Omaha and the smelter grew rapidly; within two decades the smelter's initial capital stock of $60,000 increased to $2.5 million, with over 65,000 tons of ore (then worth $14 million[3]) smelted in 1890. See Lawrence H. Larsen et al., Upstream Metropolis: An Urban Biography of Omaha & Council Bluffs 118 (2007); Nebraska: A Guide to the Cornhusker State 232 (1939). Control of the smelter passed to the American Smelter and Refining Company in 1889, and by the 1920s it "was reputed to be the nation's largest lead refinery," "produc[ing refined lead,] copper, gold, and silver," and employing hundreds of immigrants who "spoke a total of fourteen languages." Larsen, supra, at 118, 206; see Nebraska, supra, at 232. Amid the Great Depression, the smelter continued to produce 150,000 tons of "desilverized lead" a year, making it "one of the largest smelters in the world." Nebraska, supra, at 220, 232. In 1958, the smelter still had the largest lead refining capacity in the United States: 180,000 tons per year. See United States v. Am. Smelting & Ref. Co., 182 F. Supp. 834, 851 (S.D.N.Y. 1960).

Beneath the smelter's soaring smoke-stacks—one of which in 1939 was "said to be the highest self-supported metal stack in existence," Nebraska, supra, at 232—lay a darker story. An early twentieth century study of the "chief centers of the [lead] industry," including Omaha, found the lead poisoning rate for workers in 1912 was "a little over twenty-two for every 100 employed." Alice Hamilton, Lead Poisoning in American Industry, 1 J. Indus. Hygiene 8, 10 (1919). Approximately sixty years later, we upheld a finding by the Occupational Safety and Health Review Commission "that airborne concentrations of inorganic lead at" the Omaha smelter

---

[3]By comparison, last month the average official cash price for a ton of lead on the London Metal Exchange was $2,188.33. See Average Official & Settlement Prices US$/tonne for the Month of July 2014, London Metal Exchange (July 31, 2014), www.lme.com/~/media/Files/Market%20data/Historic%20Data/July%202014. xlsx. Multiplied by 65,000 tons, this price suggests the smelter's 1890 output would be worth approximately $142 million today.

seriously threatened the lives and health of employees.  Am. Smelting & Ref. Co. v. Occ. Safety & Health Review Comm'n, 501 F.2d 504, 506 (8th Cir. 1974).  The smelter "historically discharged wastewater containing lead and other pollutants directly into the [Missouri] river"—potentially "several thousand pounds of lead and other heavy metals and pollutants . . . annually."  Armstrong v. ASARCO, Inc., 138 F.3d 382, 384 & n.3 (8th Cir. 1998).  Not until 1994—after lawsuits by citizen plaintiffs and the EPA—did Asarco agree to "limitations on the levels of pollutants [the smelter] was permitted to discharge into the river."  Id. at 384-85.

According to the EPA and the State of Nebraska, lead emitted from the smelter also blew downwind and landed in residential areas of Omaha, contaminating soil. Screening in 1997 and 1998 found approximately 21% of children in the area had elevated blood lead levels—associated with lowered IQ, troubled behavior, impaired hearing, and stunted growth.  See Agency for Toxic Substances & Disease Registry, Dep't of Health & Human Servs., Public Health Assessment for Omaha Lead 11, 15 (2005).  Asarco closed the smelter in the late 1990s, paying for remediation and donating the land to the City of Omaha to use as a riverside park.  Yet approximately 10% of children in the area still had elevated levels of lead between 2000 and 2002. See id. at 23.

## B.   Superfund Litigation

In 2003, the EPA designated approximately 27 square miles around the former Asarco smelter as a Superfund site.  The EPA took enforcement action against Asarco, alleging liability of $400 million for the cost of removing lead from the affected area.  Faced with crushing environmental liabilities for "many of the largest, oldest, and most complex Superfund sites in the country, including the two largest," Asarco filed for bankruptcy in 2005.  In re ASARCO LLC, No. 05-21207, 2011 WL 2974957, at *9 (Bankr. S.D. Tex. July 20, 2011).  In 2009, the bankruptcy court approved Asarco's approximately $214 million settlement of the EPA's claims related to the Omaha site.

-4-

The EPA also named UP as a potentially responsible party. UP owned the smelter site, leasing it to Asarco until the late 1940s when Asarco bought the land. The Act extends liability to any "owner" of "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located," 42 U.S.C. §§ 9601(9), 9607(a)(1), with the only time limit on recovery beginning to run once "remedial action" begins, id. § 9613(g)(2)(B). "Liability under the statute is generally strict and subject to very narrow defenses." Stewman v. Mid-S. Wood Prods. of MENA, Inc., 784 F. Supp. 611, 615 (W.D. Ark. 1992) (M.S. Arnold, J.). Once the government proves liability, "all of the defendants are jointly and severally liable, unless a particular defendant can establish that his harm is divisible, a difficult proposition." Control Data Corp. v. S.C.S.C. Corp., 53 F.3d 930, 934 n.4 (8th Cir. 1995).

UP took the position that peeling lead-based paint—rather than airborne lead from the smelter—was "the main lead source" in the Superfund area. To obtain evidentiary support, UP filed numerous requests for EPA documents under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. UP discovered e-mails indicating some EPA officials were withholding evidence which UP believed could support its position. Learning of this possibility, Asarco sought to intervene in UP's FOIA case in the hope that material hidden by the EPA could provide a basis to void Asarco's settlement with the EPA. Yet Asarco also wanted UP to contribute a share of the $214 million already paid. To facilitate Asarco's intervention in the FOIA case, UP agreed to toll the statute of limitations applicable to any contribution action for "two years after a final judgment is obtained in the FOIA Litigation and any appeals therefrom are exhausted." Apart from the statute of limitations, the "Tolling Agreement" expressly "reserve[d] all rights and defenses which [Asarco and UP] may have . . . to contest or defend any claim or action [by] the other." Using information obtained by UP, Asarco succeeded in reducing its EPA payment by $15 million.

Meanwhile, UP and the EPA agreed to settle their respective FOIA and CERCLA claims: without admitting fault, UP would pay $25 million.  Asarco's counsel received direct notice of the tentative agreement, and notice of the CERCLA consent decree appeared in the Federal Register, see Notice of Consent Decrees, 76 Fed. Reg. 33,364 (June 8, 2011).  Asarco did not comment or object during the thirty-day public comment period, and the district court approved the settlements on August 9, 2011.  The resulting consent decree provided UP with "protection from contribution actions or claims" relating to the Superfund site.  See 42 U.S.C. § 9613(f)(2).

## C.    This Case

On May 30, 2012, Asarco filed a complaint against UP, alleging breach of contract and seeking contribution.  UP moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), asserting the consent decree precluded Asarco's claims.  Resisting dismissal, Asarco claimed the tolling agreement preserved the contribution claims "unaltered" throughout the tolling period.  According to Asarco, "UP promised not to do anything to 'alter' Asarco's Contribution Claim—or Asarco's ability to pursue that claim—for up to two years," and UP breached that supposed promise by settling with the EPA.

The district court disagreed and granted UP's motion to dismiss.  Based on the plain language of the UP consent decree, the district court found "no one can sue [UP] for 'costs incurred' in relation to the [Superfund site]."  Because granting relief to Asarco would "unravel[]" the consent decree, the district court found Asarco could not prevail "absent a specific waiver."  Carefully reading the parties' "Tolling Agreement," the district court found no specific waiver of any defense except one: statute of limitations (unsurprising given the title of the agreement).  Concluding all of Asarco's claims were either prohibited contribution claims or contribution claims "couched as indemnification and breaches of contract," the district court dismissed Asarco's complaint and entered judgment in favor of UP.

-6-

Asarco appeals, invoking our 28 U.S.C. § 1291 appellate jurisdiction.

## II.  DISCUSSION

Asarco's appeal presents three discrete questions.  First, do the Act and consent decree protect UP from Asarco's claims?  Second, did UP agree not to obtain contribution protection or use it against Asarco?  Third, is UP estopped from relying on the consent decree as a defense?  Answering these questions requires us to interpret certain provisions of the Act, the tolling agreement, and the consent decree.

We interpret statutes and contracts de novo.  See Union Pac. R.R. v. Dep't of Homeland Sec., 738 F.3d 885, 892 (8th Cir. 2013); Rapid Leasing, Inc. v. Nat'l Am. Ins. Co., 263 F.3d 820, 825 (8th Cir. 2001).  As to the consent decree, we typically afford "a large measure of deference to the interpretation of the district court that actually entered the decree."  United States v. Knote, 29 F.3d 1297, 1300 (8th Cir. 1994).  But "[w]hen, as here, a district court's interpretation of a consent decree is based solely on the written document, we review the court's interpretation *de novo*."  White v. Nat'l Football League, 585 F.3d 1129, 1141 (8th Cir. 2009).

### A.  Is UP Entitled to CERCLA Contribution Protection?

We answer the first question in the affirmative.  The district court correctly recognized that all of Asarco's claims are prohibited contribution claims even though some are disguised—like wolves "clad, so to speak, in sheep's clothing," Morrison v. Olson, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting)—as breach of contract claims.

In light of the consent decree, the Act unambiguously protects UP against any contribution claim related to the site:

A person who has resolved its liability to the United States . . . in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement.

42 U.S.C. § 9613(f)(2); see also id. § 9622(g)(5), (h)(4) (using nearly identical language).

The consent decree broadly defines the "matters addressed in the settlement" as:

all response actions taken or to be taken and all response costs incurred or to be incurred . . . at or in connection with the Site, by the United States or any other person.

We agree with the district court that this language plainly covers all Superfund remediation costs, whether incurred before or after the consent decree's effective date, including Asarco's earlier settlement with the government. As a matter of law, therefore, the Act protects UP from Asarco's contribution action. See 42 U.S.C. § 9613(f)(2); United States v. Davis, 261 F.3d 1, 27-28 (1st Cir. 2001) (finding statutory protection based on a nearly identical definition of "matters addressed in the settlement"); United States v. Se. Penn. Transp. Auth., 235 F.3d 817, 822-23 (3d Cir. 2000) (reaching the same result based on similar language).

Asarco's brief implies the Act's contribution protection for settling parties is unfair and hints UP acted duplicitously by settling with the government despite Asarco's potential contribution claim. We see nothing untoward in UP's natural desire to receive the benefits of settlement conferred by Congress. The Act's protections apply even in cases where the settling party is involved in pending contribution litigation. See, e.g., Axel Johnson, Inc. v. Carroll Carolina Oil Co., 191 F.3d 409, 420 (4th Cir. 1999) (dismissing a pending contribution appeal as moot in light of a settlement precluding contribution claims). By giving polluters an attractive incentive to settle with the government, the Act spares taxpayers the expense of trial

against companies with deep pockets and teams of lawyers. Settling existing cases allows the government to bring new enforcement cases and recover the heavy cost of environmental remediation from the parties responsible for the pollution, further encouraging "polluters to act quickly and aggressively to remedy the harm they have done." Control Data, 53 F.3d at 936; see also United States v. BP Amoco Oil PLC, 277 F.3d 1012, 1021 (8th Cir. 2002).

While firmly promoting these purposes, the Act does not leave a party such as Asarco "without remedy," Marbury v. Madison, 5 U.S. (1 Cranch) 137, 164 (1803). The problem for Asarco, as for the hapless petitioner in Marbury, is that the appropriate remedy is not the one being sought. Asarco's remedy was to object to UP's settlement and consent decree, not to launch a collateral attack.

The Act channels parties like Asarco into the settlement proceedings itself to prevent collateral litigation from undermining the consent decree. Before final settlement, the Act requires public notice and a comment period. See 42 U.S.C. § 9622(i). Asarco could have commented, but apparently chose not to. In addition, other responsible parties like Asarco may intervene as of right in the judicial settlement proceeding, raising any objections they wish. See, e.g., United States v. Union Elec. Co., 64 F.3d 1152, 1170-71 (8th Cir. 1995) (reversing entry of consent decree and remanding to allow other responsible parties to intervene); accord, e.g., United States v. Aerojet Gen. Corp., 606 F.3d 1142, 1149-50 (9th Cir. 2010); United States v. Albert Inv. Co., 585 F.3d 1386, 1399 (10th Cir. 2009). Asarco did not intervene before entry of the consent decree. With a valid excuse, Asarco might even have intervened within a reasonable period afterward to ask for a discretionary modification. Cf. Picon v. Morris, 933 F.2d 660, 662 (8th Cir. 1991). This too Asarco failed to do.

Instead of pursuing the remedies available under the Act, Asarco sought to circumvent the statutory protection conferred on settling parties. In accordance with

clear congressional intent as expressed in the plain language of the Act, the district court rejected Asarco's circumvention.

## B.    Did UP Breach the Tolling Agreement?

We answer the second question in the negative. The district court correctly concluded that UP neither waived the Act's contribution protection nor breached the tolling agreement by invoking that protection.

### 1.    Applicable Law

Federal law governs the question whether a federal statutory right is waivable. See, e.g., Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 90 (2000). But state law may still have a role to play, depending on congressional authorization. See, e.g., Burks v. Lasker, 441 U.S. 471, 477 (1979). In some statutory domains, Congress instructs the federal courts to "fashion a complete body of federal law." Id. In others, the nature of the statutory scheme requires the federal courts to incorporate state law "as the federal rule of decision." United States v. Kimbell Foods, Inc., 440 U.S. 715, 728 (1979). The threshold question here is whether Congress intended waiver of the Act's statutory settlement protection to be governed by a uniform federal rule or a federal rule dependent on state law.[4] We are not aware of any circuit decision answering this precise question, but analogous cases lead us to conclude Congress intended us to use state law to determine whether a party chose to waive contribution protection.

---

[4]We find no merit in UP's alternative argument that the Act affirmatively prohibits waiver. It is well established that both statutory and constitutional rights are presumptively waivable. See, e.g., New York v. Hill, 528 U.S. 110, 114 (2000). Giving a settling party the option to waive contribution protection furthers the Act's goal of promoting quick settlement with the government by enabling a party to exclude from protection claims by another responsible party who might otherwise intervene and derail the settlement.

Interpreting parallel provisions of the Act permitting insurance and indemnification for environmental liability, see 42 U.S.C. § 9607(e), other circuits have uniformly concluded Congress did not wish to displace state law absent a conflict with federal law. See, e.g., Harley-Davidson, Inc. v. Minstar, Inc., 41 F.3d 341, 344 (7th Cir. 1994); Beazer E., Inc. v. Mead Corp., 34 F.3d 206, 214 (3d Cir. 1994); John S. Boyd Co. v. Boston Gas Co., 992 F.2d 401, 406 (1st Cir. 1993); United States v. Hardage, 985 F.2d 1427, 1433 n.2 (10th Cir. 1993); Mardan Corp. v. C.G.C. Music, Ltd., 804 F.2d 1454, 1460 (9th Cir. 1986). The underlying principle is that the Act focuses on remedying the environmental hazard, not on prescribing how polluters privately choose to apportion the cost of doing so. See Control Data, 53 F.3d at 935-36. Although the question has never been squarely presented to our court, we implicitly joined our sister circuits by incorporating state law in a prior § 9607(e) dispute, see Lion Oil Co. v. Tosco Corp., 90 F.3d 268, 270 (8th Cir. 1996), and a prior § 9607(e)-related insurance dispute, see Aetna Cas. & Sur. Co. v. Gen. Dynamics Corp., 968 F.2d 707, 711 (8th Cir. 1992). We see no reason to treat waiver of § 9613(f)(2) differently from indemnification under § 9607(e), given that both involve parties' private allocation of costs through contract. So long as they do not jeopardize federal goals, parties should be free to waive contribution protection through contracts governed by state law.

### 2.    This Case

The state law applicable to this case is that of Nebraska. The Nebraska Supreme Court has not established a specific standard for waiver of the statutory right to contribution protection conferred by the Act, see 42 U.S.C. § 9613(f)(2), "so we are obligated to predict what it would hold if the issue were presented to it." Maschka v. Genuine Parts Co., 122 F.3d 566, 573 (8th Cir. 1997).

Waiver, under Nebraska law, "is a voluntary and intentional relinquishment or abandonment of a *known existing* legal right or such conduct as warrants an inference

of the relinquishment of such right."[5] <u>Wheat Belt Pub. Power Dist. v. Batterman</u>, 452 N.W.2d 49, 53 (Neb. 1990) (emphasis added). UP's right to contribution protection was neither "known" nor "existing" when the parties signed the tolling agreement, which predated the consent decree conferring the right by nearly two years. <u>Id.</u> We therefore predict the Nebraska Supreme Court would hold the tolling agreement did not waive UP's unknown, later-acquired right to contribution protection. <u>See</u>, <u>e.g.</u>, <u>Davenport Ltd. P'ship v. 75th & Dodge I, L.P.</u>, 780 N.W.2d 416, 425 (Neb. 2010).

In making this prediction, we recognize the Nebraska Supreme Court might read "known existing legal right" to include future rights *expressly* contemplated and relinquished. In <u>Village of Memphis v. Frahm</u>, 843 N.W.2d 608 (Neb. 2014), the Nebraska Supreme Court found a party "waived *any* claims" by waiving "any and all claims . . . whether known *or unknown*." <u>Id.</u> at 613-14 (emphasis added). The <u>Frahm</u> court did not specifically address whether any of the claims the party sought to raise were unknown at the time of the waiver, but neither did the court specify the claims were all known. It therefore seems that parties operating under Nebraska law might be able to waive uncertain future rights through specific and unambiguous language such as that used in <u>Frahm</u>. <u>Cf.</u>, <u>e.g.</u>, <u>Adams v. Philip Morris, Inc.</u>, 67 F.3d 580, 584 (6th Cir. 1995) ("Where a release waives rights unknown to the releaser at the time of signing the waiver . . . the release must be particularly scrutinized as to the intent of the parties.").

---

[5]Nebraska's definition of waiver is well established in our legal tradition. Justice Hugo Black, for example, defined waiver as "an intentional relinquishment or abandonment of a known right or privilege" in <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938). At common law, it was a "frequently recognized" principle that a landlord waives a breach by accepting rent "only where he knows [of] the [breach] at the time." <u>Roe d. Gregson v. Harrison</u>, (1788) 100 Eng. Rep. 229 (K.B.) 231-32; 2 Term Rep. 425, 430-31.

Accepting this premise without deciding it, we still conclude UP did not waive the Act's protection. Far from specifically waiving "any and all" defenses "whether known or unknown," Frahm, 843 N.W.2d at 613, the tolling agreement in this case expressly "reserve[d] all rights and defenses which [UP] may have, except as set forth in th[e tolling agreement], to contest or defend any claim or action [Asarco] may assert or initiate." Nothing in the tolling agreement "specifically waive[d] the statutory right," later acquired by UP, to contribution protection under the Act. Crete Educ. Ass'n v. Saline Cnty. Sch. Dist. No. 76-0002, 654 N.W.2d 166, 180 (Neb. 2002).

Relying on the assumption that the parties "intended to preserve [the] contribution claims *intact* and *unaltered* until conclusion of the FOIA action," Asarco concludes an "explicit waiver" was not necessary. We cannot accept Asarco's predicate assumption because we agree with the district court that "[t]here is no clear agreement between the parties to preserve anything other than an extended two-year statute of limitations." Asarco's reliance on a provision in the tolling agreement regarding alternative dispute resolution is especially misplaced because this provision is inextricable from UP's unambiguous reservation of "all [other] rights and defenses."

But even if Asarco's assumption were true, it was not the "conclusion of the FOIA action," but rather the conclusion of the EPA's separate CERCLA action which gave UP contribution protection. The government notified Asarco in a pre-settlement filing in the FOIA action that "[i]f settlement negotiations between [UP and the EPA] are successful in resolving . . . the CERCLA claims, . . . [they] would then file that settlement agreement in the context of *a CERCLA case*." (Emphasis added). That is precisely what happened. The FOIA and CERCLA cases, resolved through two settlements on the same date, remained formally distinct. Asarco's contribution claims remained fully intact until the end of the FOIA case, when UP—without

breaching any provision of the tolling agreement—simultaneously received a statutory defense by settling the CERCLA case.

In any event, Asarco's conclusion is independently flawed. UP's contribution protection is a statutory right, and Nebraska law requires waiver of known and existing statutory rights to be "clear and unequivocal." Bacon v. DBI/SALA, 822 N.W.2d 14, 32 (Neb. 2012). The Nebraska Supreme Court "'will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is *explicitly* stated.'" Hogelin v. City of Columbus, 741 N.W.2d 617, 624 (Neb. 2007) (emphasis added) (quoting Metro. Edison Co. v. NLRB, 460 U.S. 693, 708 (1983)). We agree with the district court that the tolling agreement contains "no language that expressly waives the CERCLA contribution defense." See, e.g., Zarrs v. Keck, 58 N.W. 933, 935 (Neb. 1894).

Given that UP had not yet acquired statutory contribution protection, we are all the more convinced there was no waiver under Nebraska law. UP also did not breach any contractual obligation to Asarco because nothing in the tolling agreement prevented UP from obtaining protection under the Act.

## C.    Is UP Estopped from Invoking Contribution Protection?

We decline to answer the third question because Asarco never presented its estoppel argument to the district court.

On appeal, Asarco informs us Count III of its complaint, requesting a declaration that UP "may not assert contribution protection under [the Act]," rests on an estoppel theory. Asarco accuses the district court of "fail[ing] to consider whether the allegations in the Complaint regarding [UP's] misleading communications could form the basis for estoppel" and "simply ignor[ing] these allegations in the Complaint, which are sufficient to make out a claim for declaratory judgment in

-14-

Count III based on estoppel or waiver of the right of contribution protection." Asarco also accuses UP of "having ignored Count III of the Complaint below."

Asarco's accusations are unfounded. None of Asarco's district court filings mention estoppel. Asarco's response to UP's motion to dismiss had only this to say about Count III:

> Count III ("Declaratory Judgment Under Federal Law") is a properly pled claim for a declaratory judgment that UP "must abide by its promises *in the Tolling Agreement* to preserve Asarco's claims unaltered for the term of the Tolling Agreement and may not assert contribution protection . . . against Asarco's contribution claim . . . related to the [site]." The Federal Declaratory Judgments Act enables this Court to do exactly what Asarco's claim requests—"declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). The Eighth Circuit routinely upholds declaratory judgments that "determine" *contractual* rights. See, e.g., Maytag Corp. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., 687 F.3d 1076, 1083 (8th Cir. 2012).

(Omissions in original) (citation to the record omitted) (emphasis added). Not only does this paragraph—the only one addressing Count III—fail to mention estoppel, it expressly links Count III solely to "promises in the Tolling Agreement" and asks for a declaration of "contractual rights."

Having thus limited itself to the tolling agreement and failed to mention estoppel, Asarco should not be surprised neither the district court nor UP searched the record to uncover vague extra-contractual allegations. "'Judges are not like pigs, hunting for truffles buried in briefs'" or the record. Brown v. City of Jacksonville, 711 F.3d 883, 888 n.5 (8th Cir. 2013) (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam)).

Asarco forfeited the right to relief on appeal by failing to raise its estoppel theory below.  See, e.g., Hartman v. Smith, 734 F.3d 752, 761-62 (8th Cir. 2013).

## III.   CONCLUSION

Called upon for the second time in the last hundred years to resolve a smelter-related dispute between Asarco and UP, see Am. Smelting & Ref. Co. v. Union Pacific R.R., 256 F. 737 (8th Cir. 1919), we affirm the district court's well-reasoned opinion and judgment.

_____