544

## LANCASHIRE SHIPPING CO., Limited, v. UNITED STATES.

District Court, S. D. New York.
June 14, 1933.

Hunt, Hill & Betts, of New York City (George C. Sprague, of New York City, of counsel), for plaintiff.

George Z. Medalie, U. S. Atty., of New York City (Frank Chambers, Asst. U. S. Atty., of New York City, of counsel), for defendant.

COXE, District Judge.

This is a suit under the Tucker Act (28 USCA § 41 (20) to recover a penalty of $5,000, paid by the plaintiff under protest, for failing to manifest smoking opium alleged to have been on board the steamship Kendal Castle on her arrival at Brooklyn, N. Y., in September, 1928.

The facts have been mostly all stipulated, and are not in dispute, and the government does not seriously question that under the de-

cision in The Mount Clinton (C. C. A.) 6 F. (2d) 418, the vessel was not liable for penalties, but it is insisted that there can be no recovery because (1) the amount sued for was a voluntary payment by the plaintiff; and (2) the action is on a tort claim, and not within the Tucker Act.

The plaintiff is a British corporation, and the owner of the steamship Kendal Castle. In the summer of 1928, the vessel loaded merchandise in the Far East for the United States, and, after stopping at various American ports, docked at Pier 36, Brooklyn, to take on a return cargo. While the vessel was still at Pier 36, and in the early morning of September 11, 1928, two police officers discovered 750 cans of smoking opium in possession of two Chinese in a taxicab outside of the pier. The opium was seized, but the Chinese were allowed to escape; and a few hours later, when the chief officer of the vessel mustered his crew, it was found that two sailors were missing. There was nothing to show, however, that the opium came from the Kendal Castle, and for aught that appears in the record it may as well have come from one of the four other steamers lying at the time at Pier 36. The opium was, of course, not manifested; and it is conceded that the Kendal Castle was "used * * * as a common carrier" within the meaning of section 594 of the Tariff Act of 1922 (19 USCA § 498).

It has been satisfactorily shown that neither the master nor any of the other officers nor the ship's agent had any knowledge or suspicion that there was opium on the vessel; and unusual precautions were taken not only in the Far East but at all of the unloading and loading ports in this country to discover opium, and to prevent contraband from being taken ashore. Indeed, there is no dispute that such measures were taken, and the government concedes that neither the owner nor the master was "a consenting party or privy" to any illegal act; so, clearly, the vessel was not subject to seizure or forfeiture. The Mount Clinton, supra.

On September 13, 1928, the collector of customs at New York refused clearance to the vessel unless the master and the ship's agent executed a bond in the amount of $131,-250 for computed penalties. This bond was immediately furnished, and the vessel thereupon cleared. Then, on May 3, 1929, a penalty of $98,000 was assessed under section 584 of the Tariff Act of 1922 (19 USCA § 486); and subsequently the master petitioned the Treasury Department for remission or

mitigation. This resulted in a decision mitigating the penalty to $5,000, provided payment was made in 30 days. The master then filed a supplemental petition for remission, which was denied on January 31, 1930. Thereupon the collector made demand on the ship's agent for payment of the mitigated penalty of $5,000, at the same time threatening suit for the full penalty of $98,000 unless the demand was complied with; and in response thereto the ship's agent, on February 13, 1930, paid the $5,000 to the collector, under protest.

The bond given to the collector to obtain clearance of the vessel was improperly exacted (The Mount Clinton, supra); and the $5,000 paid by the plaintiff under protest was in no sense a voluntary payment. It is no answer that the plaintiff might have defended successfully on the bond; for the plaintiff was not required to run the risk of a possible judgment against it for $98,000. Neither was the payment a compromise of disputed claims, as the vessel was immune from seizure; and even the liability of the master was hardly open to question, despite the reluctance of Judge Learned Hand to pass on the point in The Mount Clinton, supra, page 419 of 6 F.(2d). Furthermore, under the terms of the bond, the government did not relinquish its rights against the vessel, and the execution of the bond did not, therefore, remove the menace of reprisals in the event the penalties remained unpaid. Moreover, it was just as much duress to exact the payment of the penalty after the execution of the bond as it would have been had no bond been given; in either event the exaction was illegal, and the payment was made under compulsion.

The remaining point pressed by the government, namely, that there is no jurisdiction of the suit under the Tucker Act, is, I think, fully met by the decision in United States v. Compagnie, etc. (C. C. A.) 26 F.(2d) 195, 197, where it was held that "the right of recovery is based upon a law of Congress." The government officials were acting under express statutory authority in requiring that the bond be furnished, and in exacting payment of the penalty; and there is no analogy to United States v. Holland-America Line, 254 U. S. 148, 41 S. Ct. 72, 65 L. Ed. 193, where the exactions were without warrant of law, and it was therefore held that the payments were tortious.

The plaintiff is entitled to judgment for the amount demanded in the complaint, namely, $5,000.