## LANCASHIRE SHIPPING CO., Limited, v. UNITED STATES.

District Court, S. D. New York.
Dec. 28, 1936.

Hunt, Hill & Betts, of New York City (John W. Crandall and Frank J. Zito, both of New York City, of counsel), for plaintiff.

Lamar Hardy, U. S. Atty., of New York City (William F. Young, of New York City, of counsel), for the United States.

PATTERSON, District Judge.

The suit is to recover a fine of $5,000 assessed and collected by the Secretary of the Treasury. The fine was imposed under section 584 of the Tariff Act of 1930 (19 U.S.C.A. § 1584 and note), to the effect that, where smoking opium or opium prepared for smoking should be found unmanifested on board any vessel, a penalty of $25 for each ounce should be imposed on the master or owner, except that in case the vessel should be a common carrier there should be no fine if it appears to the satisfaction of the court that neither the master nor any of the officers (including licensed and unlicensed officers and petty officers) nor the owner of the vessel knew, and could not, by the exercise of the highest degree of care and diligence, have known, that such smoking opium or opium prepared for smoking was on board."

As shown at the trial, the plaintiff owned the motorship Raby Castle, used as a common carrier. The personnel consisted of 17 officers, all British, and 28 seamen, all Chinese. In late 1930 the Raby Castle took on cargo at various Asiatic ports. The vessel arrived in New York on January 26, 1931. A party of 7 or 8 customs agents under the direction of In-

spector Sterling went on board and made a search for contraband. One of the agents found 529 cans of smoking opium hidden in the base of the foremast in the shelter deck. The cans held some 197 pounds of opium. There followed the fine, mitigated down to $5,000 by the Secretary of the Treasury and paid by the plaintiff under protest.

The mast was hollow, with an opening about one foot above the shelter deck. The opening was large enough for a man to enter. It was covered by a plate secured by bolts and nuts. The plate would not be removed except at periodical surveys and at times when the interior of the mast might be painted. On a previous voyage Sterling had spoken to the chief officer about the hole in the mast as a possible hiding place for opium and had suggested that the plate be fastened more securely. The suggestion was not carried out. On the voyage in question, the officers of the Raby Castle had inspected the hole at Surabaya, where cargo was taken on board and stowed around the mast. The vessel later went to five other Asiatic ports to take on cargo, but no further inspection of that particular place was made. The officers thought that the cargo stowed high around it made it inaccessible. But it was possible for one or more of the crew to have crawled over the cargo, opened a small space near the mast, and removed the plate, and that is evidently what happened.

In many ways the officers took pains to prevent the smuggling of opium. They knew that with a Chinese crew there were unusual risks of traffic in opium, They overhauled the entire ship at Surabaya and thereafter examined all effects brought on board by the crew. There were also searches made in the course of the voyage for stowaways and contraband.

I am of opinion that the plaintiff should not recover the fine paid. It has not shown that the officers of the Raby Castle used "the highest degree of care and diligence" to find out whether opium was on board.

Under the law as it stood prior to the Tariff Act of 1930, a fine on unmanifested opium found on a vessel that was a common carrier was not to be imposed unless the master or owner was "a consenting party or privy" to the smuggling. Tariff Act of 1922, § 594 (19 U.S. C.A. § 498); Lancashire Shipping Co. v. United States (D.C.) 4 F.Supp. 544, decided by Judge Coxe. The 1930 act laid down a stiffer rule. Experience under the earlier law had evidently shown that opium in excessive amounts was being smuggled into the country from abroad. So the liability to fine was made absolute, except that in a case involving a common carrier there was to be no fine if it were made to appear to the satisfaction of the court that the presence of the opium was not known by owner, master, or any officer and could not have been known by use of "the highest degree of care and diligence." These are strong words. If the owner would escape a fine, he must prove that he left no stone unturned to prevent the carrying of opium. From the fact that the clause in question is carried in the form of an exception to the enacting clause, and also from the reference to "the satisfaction of the court," it is plain that Congress intended the burden of proving the highest degree of care and diligence to be on the party who contended that there ought to be no fine.

The officers of the Raby Castle went to some lengths to prevent the carriage of opium. But they did not do enough, particularly in view of the fact that a customs inspector had already called attention to the likelihood that the hole in the mast might be used as a hiding place. They could have looked into the hole shortly before arrival. Careful search by the customs officers turned up the opium, and the officers of the ship might have made as careful a search. Or they could have bolted the plate fast, as had already been suggested to one of them. The "highest degree of care and diligence" demanded one measure or the other.

There will be judgment for the defendant, with costs.