# United States Court of Appeals

### For the Eighth Circuit

_____

No. 12-2143

_____

Union Pacific Railroad Company

*Plaintiff - Appellee*

v.

United States Department of Homeland Security; Rand Beers, in his official capacity

*Defendants - Appellants*

_____

United States of America

*Plaintiff - Appellant*

v.

Union Pacific Railroad Company

*Defendant - Appellee*

_____

United States of America

*Plaintiff - Appellant*

v.

Union Pacific Railroad Company

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha
_____

Submitted: May 14, 2013
Filed: December 12, 2013
_____

Before RILEY, Chief Judge, MELLOY and SHEPHERD, Circuit Judges.
_____

RILEY, Chief Judge.

On thirty-eight occasions between 2001 and 2006, United States Customs and Border Protection (CBP), a component of the U.S. Department of Homeland Security (DHS), found illegal drugs secreted on trains brought to the U.S. border by Ferrocarril Mexicano S.A. de C.V. (Ferromex) or Kansas City Southern de Mexico S.A. de C.V. (KCSM), both Mexican railroads. Although the Union Pacific Railroad Company (UP) did not control the trains before their arrival at the U.S. border[1] or even during the time CBP inspected the trains at the border, CBP imposed almost $38 million in penalties against UP—not Ferromex or KCSM—under the Tariff Act of 1930, as amended, 19 U.S.C. § 1584(a)(2). CBP's shifting explanations make it difficult to decipher precisely why CBP thinks it has the power to impose these penalties against UP, but the government's present position appears to be that UP is liable because UP (1) owned some of the individual railcars in which CBP found illegal drugs and (2) forwarded electronic manifest information to CBP, which does not accept electronic manifests directly from Mexican railroads.

_____

[1]Individual trains arrived at border crossings in California, Arizona, and Texas.

-2-

After exhausting its administrative remedies, UP challenged the penalties in the district court below, invoking the Fifth and Eighth Amendments to the Constitution, and the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A). The government separately filed enforcement actions, which were consolidated with UP's suit in the district court. UP moved for summary judgment, and the government moved for judgment on the administrative record. Finding CBP lacked statutory authority to penalize UP and the penalties were arbitrary and capricious, the district court ruled in UP's favor and enjoined the government from penalizing UP for smuggled drugs until the agency "properly promulgated" regulations authorizing such penalties.

The government appeals. We reject CBP's constitutionally suspect contention that the Tariff Act authorizes the heavy fines at issue in this case. The statute does not authorize penalties against UP for drugs found on railcars UP neither owns nor controls. And the statute certainly does not authorize CBP to require UP, as a common carrier, to do more than reasonably possible to prevent Mexican drug cartels from hiding drugs on trains UP does not control in a country in which UP has no operations. However, the district court's imprecise injunction must be corrected. Having jurisdiction under 28 U.S.C. § 1291, we affirm in part, vacating only the injunction.

## I. BACKGROUND
### A. Facts

UP is an Omaha, Nebraska, based common carrier with no railroad operations inside Mexico, no control over the Mexican railroads[2] that bring trains to the U.S. border, no power to direct these Mexican railroads' employees, and no legal authority to secure or search trains inside Mexico. Nor can UP search trains at the border before CBP conducts its inspection: CBP refuses to allow such searches by UP.

---

[2]Although UP owns a minority stake (26%) in Ferromex, the privately held Mexican corporation which owns the remaining 74% solely controls Ferromex.

Instead, CBP takes custody of Mexican trains at the border, inspects them, sends the Mexican locomotives with their Mexican crews back to Mexico, and, when this process is completed, allows UP to take custody of the trains. UP, as a common carrier, accepts these trains and delivers them to their destinations in the United States.

Despite these limitations, UP works to prevent Mexico's drug cartels from smuggling drugs into the United States. Throughout its railroad network, UP employs more than 200 commissioned police officers, 300 contract security officers, and nine canine drug detection teams. At the Texas, California, and Arizona international borders alone, UP spends approximately $2.4 million annually on salary and benefits for its security teams. At its own cost, UP has built numerous buildings for CBP's use, including camera and inspection towers and an office building, and installed advanced screening machines at the border. UP was the first railroad to enter CBP's "Land Border Carrier Initiative Program" and "Customs-Trade Partnership Against Terrorism," and is also a member of various other partnerships between the federal government, state and local governments, and private transportation firms. UP has persuaded Ferromex to increase its security measures in Mexico, even though drug related safety concerns in Mexican border towns drastically limit Ferromex's ability to protect U.S.-bound trains.[3]

---

[3] See, e.g., June S. Beittel, Cong. Research Serv., R40582, Mexico's Drug-Related Violence 10 (2009) ("The violence in Mexico has included the assassination of high level government officials as well as gruesome murders (often carried out with garish one-upmanship) and kidnappings."); David Luhnow et al., Just an Ordinary Day of Death in Mexico's War on Drug Traffickers, Wall St. J., August 27, 2011, at A1 ("The pace of [drug related] killings is escalating. More than half the dead, 22,000, were killed in the past 18 months, *a rate of one every 35 minutes*. . . . Places like Ciudad Juarez, one of the most violent cities in the world, keep a tally of the dead. But in other parts of Mexico, the murders aren't even counted up." (emphasis added)).

In spite of these facts, CBP imposed almost $38 million in fines against UP after finding illegal drugs hidden on Mexican trains arriving at the U.S. border. According to CBP, UP was liable for the illegal drugs even though UP had no control over the trains until after CBP discovered the illegal drugs. By UP presenting the Mexican manifests in the United States, CBP asserts UP "is responsible for [the manifests'] accuracy," and "it is incumbent upon [UP] to *ensure* that the railcars are inspected in Mexico." CBP concedes UP had no knowledge of the drugs, which were hidden in railcar "spines" (i.e., an area outside the locked cargo hold), in exposed chutes, under exterior plates, or inside tank cars. Although UP may have owned as many as eleven[4] of the numerous railcars involved, these railcars were pulled by Mexican locomotives and the trains were crewed by the Mexican railroads' employees.

CBP's proposed fines against UP ranged from $16,579 to more than $8.2 million per incident. CBP even fined UP $655,215 for an incident on March 30, 2004, in which UP itself, working with U.S. Immigration and Customs Enforcement (ICE) agents, found illegal drugs that CBP missed. That morning, a Ferromex train reached the U.S. border at Calexico, California, and CBP personnel conducted their routine inspection: they found nothing, cleared the train, and left. But a UP police officer who was working with an ICE agent decided, based on a tip, to inspect the train's non-pressurized tank cars. The UP officer, seeing signs that someone had

---

[4]The government asserted in the district court that UP owned ten or eleven of the railcars at issue, but did not specify the exact number in its appellate brief. At argument, UP estimated it owned seven of the railcars. The record citations provided by the government point to some railcar numbers beginning with "UP" and others with different letters. We cannot determine from the record whether these other letters mean the railcars are owned by UP through subsidiaries, leased by UP from other entities, or not owned by UP at all, for example, owned by UP's customers. Therefore, we must agree with UP that the government has not "provided . . . the record citations and [other information] . . . need[ed] to identify which [rail]cars were owned by UP."

tampered with one of the tank cars' domes, obtained a wrench to open the dome. Inside, the UP officer and the ICE agent found two large bags of marijuana weighing 37.15 kilograms (81.73 pounds). The ICE agent contacted CBP, which dispatched two officers to the train. The UP officer and one of the CBP officers then removed the bags from the train and placed them in CBP custody. Despite UP's diligence, CBP imposed a fine against UP. CBP has never explained why UP's active role in uncovering the marijuana was not enough to absolve UP of liability.

## B. Administrative Proceedings

UP initially sought an administrative remedy, challenging CBP's authority to impose the penalties and, alternatively, requesting complete mitigation of all penalties. In a series of boilerplate decisions, CBP reaffirmed its power to impose the penalties but, with little explanation, offered to reduce the penalties by 90-95% if UP paid within 60 days. See 19 C.F.R. § 171.22. CBP concluded UP must "ensure railcar inspection in Mexico."

UP explained it was not reasonably possible for UP employees to inspect Mexican trains inside Mexico. Safety risks in Mexico are so severe that the U.S. Department of Agriculture, which formerly inspected U.S.-bound trains on the Mexican side of the border, has withdrawn its personnel from Mexico for security reasons and ceased inspections. If UP dispatched its security personnel into Mexico, they "would not be permitted to carry firearms for protection, would not be permitted to make arrests, and could even risk arrest themselves—if they f[ound] drugs—for possessing the drugs." Because local Mexican police are often at the mercy of violent drug cartels, it is likely any UP efforts on the Mexican side of the border would be thwarted by local police.[5]

_____

[5]Cf., e.g., David Luhnow et al., supra, at A1 ("Authorities and journalists in the northern border state of Tamaulipas, across from Texas, are so cowed by drug gangs that neither publicly reports drug-related homicides.").

CBP countered that it "does not expect [UP] to create a police force in Mexico equal to its force in the U.S.[, and] [i]nstead . . . ask[s] that [UP] provide[] for *basic railcar inspections* in Mexico, utilizing [CBP] training on the subject." "If [UP] alone cannot achieve this objective," CBP said, "then [UP] should work in conjunction with its business partner, Ferromex, or hire a third-party security contractor." Security concerns in Mexico are so severe—and local police so ineffective in the face of heavily armed drug cartels—that Ferromex must rely on the Mexican *military* to prevent drug smuggling on its trains. Ferromex trains bound for the United States are searched two or three times by the Mexican military before reaching the border. None of CBP's administrative decisions explain how UP, the Mexican railroads, or "a third-party security contractor" could accomplish what the Mexican military cannot.

Although some of CBP's decisions purported to tie UP's liability to its electronic transmission of manifests from Ferromex and KCSM, CBP also said "[t]he pertinent question in this case is *not* who was responsible for *presenting the manifest*, but rather, whether, as the carrier, UP[] exercised the highest degree of care and diligence in preventing the drug smuggling in its railcar[s]." (Emphasis added). The phrase "highest degree of care and diligence" comes from 19 U.S.C. § 1584(a)(2), which exempts from penalty certain common carriers who exercise it. Although § 1584(a)(2) does not define the term, in 1988 Congress expressly directed the relevant agency to explain what the phrase means:

> By no later than the date that is 120 days after the date of enactment of this Act and after an opportunity for public comment, the Secretary of the Treasury *shall* prescribe regulations which set forth criteria for use by the owner, master, pilot, operator, or officer of, or other employee in charge of, any common carrier in meeting the standards under sections 584(a)(2) and 594(c) of the Tariff Act of 1930 (19 U.S.C. 1584(a)(2) and 1594(c)) for the exercise of the *highest degree of care and diligence*

>to know whether controlled substances imported into the United States
>are on board the common carrier.

Anti-Drug Abuse Act of 1988, Pub. L. No. 100–690, § 7369, 102 Stat. 4181, 4481 (emphasis added). More than two decades later, neither the Secretary of the Treasury, who in 1988 was the cabinet official responsible for CBP's predecessor agency, nor the Secretary of Homeland Security (Secretary), who now oversees CBP, has complied with Congress's express directive.[6]

### C.    Article III Proceedings

On July 31, 2008, having exhausted its administrative remedies, UP filed a complaint in the District of Nebraska against DHS and the Secretary (collectively, the government). UP sought a judgment declaring the penalties void and enjoining DHS and its components from imposing new penalties against UP. On March 17, 2009, the government filed a complaint in the Southern District of Texas seeking a judgment of $4,128,000 in penalties against UP for one of the thirty-eight incidents at issue in this case. On March 18, 2009, the government filed a complaint in the Southern District of California seeking a judgment against UP for $33,595,112 in penalties for the other thirty-seven incidents at issue in this case. In November 2010, the government's cases were transferred to the District of Nebraska and consolidated with UP's case.

---

[6]In 1989, CBP's predecessor, the U.S. Customs Service (USCS), notified the public of proposed regulations. See 54 Fed. Reg. 4835, 4836 (Jan. 31, 1989). After digesting the public's comments, USCS invited comment on an updated proposal. See 56 Fed. Reg. 5665, 5668-69 (Feb. 12, 1991). Without explanation, the proposed regulations (identified by the number 1515-AA67), disappeared from the agency's rulemaking agenda in 1995. Compare 60 Fed. Reg. 23781 (May 8, 1995) (listing the regulations), with 60 Fed. Reg. 60452 (Nov. 28, 1995) (not listing the regulations), and 61 Fed. Reg. 23468 (May 13, 1996) (same).

UP moved for summary judgment, and the government moved for judgment on the administrative record. On March 14, 2012, the district court granted UP's motion and denied the government's motion, concluding that "CBP's actions were outside the authority granted to the agency by Congress and must be set aside." The district court primarily relied on its conclusion that the agency's failure to comply with its statutory obligation to define the phrase "highest degree of care and diligence," as used in 19 U.S.C. § 1584(a)(2), meant the agency received no deference for its contention that meeting this standard required UP to "'leave no stone unturned.'" Instead, the district court looked to the common law definition and concluded "a common carrier must only use the degree of skill a *reasonable common carrier* would use under similar circumstances." (Emphasis added). The district court noted "the agency acknowledge[d] that UP has undertaken numerous measures to discover, combat, and prevent drug smuggling." Because "CBP ha[d] not presented evidence, or even argument, with respect to industry standards or commercial practices with respect to drug interdiction by common carriers," the district court "f[ound] that CBP's actions were *ultra vires*."

In the alternative, the district court found "that CBP's interpretation and application of the Tariff Act [were] arbitrary and unreasonable" for three reasons. First, CBP wholly failed to "address[] UP's argument that it had no control over the railcars in Mexico, had no controlling interest in the Mexican railroad, and could not exercise any degree of care and diligence until the point at which the railcars were under its control." Second, "CBP's suggestions that UP either force Ferromex to take action or hire a private security force . . . [were] not only arbitrary, but capricious, in that they [were] essentially impossible for UP to accomplish." Third, "CBP failed to articulate why it exercised discretion the way it did or to offer a rational connection between the facts presented and the choice to impose penalties."

Having reached these dispositive conclusions, the district court explained it did not need to decide any constitutional issue. The district court did find "grave

constitutional concerns would arise if the court were to enforce CBP's interpretation of the statutes." The district court then (1) declared the fines "null and void and unenforceable," (2) granted judgment in UP's favor, (3) reversed CBP's decisions in the thirty-eight administrative adjudications at issue, and (4) vacated the penalties. The district court also enjoined DHS and the Secretary, along with their officers, agents, and employees, from imposing any penalties against UP under "19 U.S.C. § 1584, for failure to manifest illegal drugs found in railcars over which [UP] has no control entering the United States from Mexico, until such time as regulations permitting such action are properly promulgated." The government appeals.

## II.    DISCUSSION

We review de novo the district court's various legal conclusions. See, e.g., United States v. Fernandez, 710 F.3d 847, 849 (8th Cir. 2013) (reviewing "constitutional challenges de novo"); United States v. Jungers, 702 F.3d 1066, 1069 (8th Cir. 2013) (reviewing de novo a question of statutory interpretation); Clark v. USDA, 537 F.3d 934, 939 (8th Cir. 2008) (reviewing de novo an award of summary judgment in a case challenging administrative action); Entergy Ark., Inc. v. Nebraska, 358 F.3d 528, 553-54 (8th Cir. 2004) (reviewing de novo whether a particular remedy was available). CBP's administrative decisions receive deferential review under the APA. "We will not disturb the [agency]'s action unless it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.'" Clark, 537 F.3d at 939 (quoting 5 U.S.C. § 706(2)).

### A.    Constitutional Avoidance

Both parties offer competing interpretations of the relevant statute, and UP also raises significant constitutional challenges against CBP's interpretation. It is a bedrock principle of statutory interpretation that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter."

U.S. ex rel Attorney Gen. v. Del. & Hudson Co., 213 U.S. 366, 408 (1909); see also, e.g., Clark v. Martinez, 543 U.S. 371, 381 (2005).  We adhere to this principle of constitutional avoidance "out of respect for Congress, which we assume legislates in the light of constitutional limitations."  Rust v. Sullivan, 500 U.S. 173, 191 (1991); see also Ashwander v. TVA, 297 U.S. 288, 345-48 (1936) (Brandeis, J., concurring).

Constitutional avoidance trumps even Chevron deference, and easily outweighs any lesser form of deference we might ordinarily afford an administrative agency such as CBP.  See, e.g., Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs, 531 U.S. 159, 172 (2001) ("Where an administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result."); cf. Chevron U.S.A. Inc. v. Natural Res. Def. Council, 467 U.S. 837 (1984); Skidmore v. Swift & Co., 323 U.S. 134 (1944).  We "assum[e] that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority."  Solid Waste, 531 U.S. at 172-73.  When an agency's interpretation of a statute pushes these limits, we "heed[] the essence of Mr. Chief Justice Marshall's admonition in Murray v. The Charming Betsy, 6 U.S. (2 Cranch) 64, 118 (1804), by holding that [the statute] ought not be construed to violate the Constitution if any other possible construction remains available."  NLRB v. Catholic Bishop of Chi., 440 U.S. 490, 500 (1979).  Without the "clearest indication" that Congress intended to enact a constitutionally suspect statute, NLRB v. Drivers Local 639, 362 U.S. 274, 284 (1960), we follow "the traditional rule" and "independently inquire whether there is another interpretation, not raising . . . serious constitutional concerns, that may fairly be ascribed to [the statute]," Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 577 (1988).

Consistent with these cardinal principles, before analyzing the parties' interpretations of the statute "it is incumbent on us to determine whether the

-11-

[agency]'s [interpretation] would give rise to serious constitutional questions." Catholic Bishop, 440 U.S. at 501.  We conclude it would.

### 1.    Due Process

Under CBP's interpretation, § 1584(a)(2) allows the government to punish an innocent owner or recipient of property for misuse of the property while the property is entirely under a third party's control even if the misuse occurs without the third party's knowledge and despite the third party's best efforts to prevent it.  If CBP is correct, § 1584(a)(2) pushes the limits of the Fifth Amendment, which guarantees UP shall not "be deprived of . . . property[] without due process of law."  Neither our court nor the Supreme Court has ever sanctioned a scheme to punish innocent owners for "the misconduct of mere strangers, over whom such owners or [the owners'] consignees could have no control," Peisch v. Ware, 8 U.S. (4 Cranch) 347, 365 (1808).

To the contrary, we have expressly presumed that "the imposition of severe penalties . . . for the commission of a morally innocent act may violate the due process clause of the fifth amendment." United States v. Enochs, 857 F.2d 491, 494 n.2 (8th Cir. 1988).  And in a long line of cases stretching back to Chief Justice Marshall's decision in Peisch, the Supreme Court has "implied that it would be difficult to reject the constitutional claim . . . . of an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property." Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 689 (1974).

### 2.    Common Law Forfeiture

Whether CBP may expand the fraught common law forfeiture tradition past its historical limits is a "grave and doubtful constitutional question[]," Del. & Hudson, 213 U.S. at 408.  The Supreme Court has held the common law tradition permitting "forfeitures of property intrusted by [an] innocent owner or lienor to another who

-12-

[mis]uses it," <u>Van Oster v. Kansas</u>, 272 U.S. 465, 468 (1926), "is too firmly fixed in the punitive and remedial jurisprudence of the country to be now displaced." <u>J.W. Goldsmith, Jr.-Grant Co. v. United States</u>, 254 U.S. 505, 511 (1921). Even as the Supreme Court has narrowly preserved this tradition, the Supreme Court has consistently treated it as a limited exception to, rather than rule of, Fifth Amendment due process. <u>See</u>, <u>e.g.</u>, <u>Bennis v. Michigan</u>, 516 U.S. 442, 453 (1996) ("Th[e] argument" that a strict liability "forfeiture statute is unfair because it relieves prosecutors from the burden of separating co-owners who are complicit in the wrongful use of property from innocent co-owners . . . , in the abstract, has considerable appeal."); <u>id.</u> at 456 (Thomas, J., concurring) ("It . . . seems appropriate, where a constitutional challenge by an innocent owner is concerned, to apply th[e]" "limits on *what* property can be forfeited" "rather strictly, adhering to historical standards."); <u>id.</u> at 458 (Ginsburg, J., concurring) (noting the Supreme Court does not "condone" "an experiment to punish innocent third parties"); <u>id.</u> at 463 (Stevens, J., dissenting) (calculating "a majority of the Members of th[e] [Supreme] Court has agreed that the concept of an instrumentality subject to forfeiture . . . must have an outer limit"). Justice Thomas even views this tradition's longevity as "a reminder that the Federal Constitution does not prohibit everything that is *intensely* undesirable." <u>Id.</u> at 454 (Thomas, J., concurring) (emphasis added).

In three ways, CBP's application of § 1584 goes far beyond this tradition's narrow limits. First and most obvious, the punishments at issue in this case are not forfeitures.[7] <u>Cf.</u>, <u>e.g.</u>, <u>id.</u> ("*[F]orfeiture* of *property* without proof of the owner's

---

[7] Both the government and UP apparently think that the due process analysis is the same for forfeitures, which are *in rem* penalties, and fines, which are *in personam* penalties. We are not convinced. The only authority the parties cite for this proposition is the Seventh Circuit's unsupported statement in <u>Towers v. City of Chi.</u>, 173 F.3d 619, 626 (1999), "that any distinction between [these two penalties] is one of form, but not substance." The proposition that an innocent owner may lose more than the value of his misused property without receiving full due process protection

-13-

wrongdoing, merely because it was 'used' in or was an 'instrumentality' of crime has been permitted in England and in this country, both before and after the adoption of the Fifth and Fourteenth Amendments." (emphasis added)).

Second, unlike the property at issue in all of the Supreme Court cases upholding forfeiture, the property in this case was not misused by its owner, consignor, or consignee. Cf., e.g., Goldsmith, 254 U.S. at 512 (expressly reserving the question whether the Fifth Amendment could allow forfeiture of property used "without [the owner's] *privity or consent*" (emphasis added)). Rather, unknown persons (presumably operatives of Mexico's dangerous drug cartels) hid drugs, without UP's or the Mexican railroads' knowledge, inside railcars that were not under UP's control. Cf. Peisch, 8 U.S. (4 Cranch) at 364 (rejecting forfeiture where the misuse occurred without the owner's "consent or connivance, or . . . that of some other person employed or trusted by him").

Third, UP (whether as owner, consignor, or consignee) has not been a negligent bystander to the misuse of the property. Cf., e.g., Austin v. United States, 509 U.S. 602, 615 (1993) (explaining that "[b]oth theories [underlying common law forfeiture] rest, at bottom, on the notion that the owner has been negligent in allowing his property to be misused and that he is properly punished for that negligence"). Quite the opposite: UP's contention that it has done all it reasonably can to prevent drug smuggling—without placing its employees in grave danger by sending them to Mexico—is buttressed by the fact that, in at least one case, UP found smuggled drugs

_____

finds no support in Supreme Court or common law precedent. See, e.g., Dobbins' Distillery v. United States, 96 U.S. 395, 399-400 (1877) (explaining that common law "seizures and forfeitures created by statute *in rem*, cognizable on the revenue side of the exchequer court," were an exception to the general common law rule—that "the crown . . . had no right to the goods and chattels of the felon, without producing record of his conviction"—because "*the thing* in such . . . case[s] [wa]s primarily considered as the offender" (emphasis added)); see also Goldsmith, 254 U.S. at 513.

-14-

CBP's inspection overlooked. Furthermore, the Mexican railroads, under pressure from UP, have undertaken significant preventive efforts, notably subjecting trains to repeated searches by the Mexican military. Cf., e.g., id. at 616 ("In none of the[] [forfeiture] cases did the Court apply the guilty-property fiction to justify forfeiture where the owner had done *all that reasonably could be expected* to prevent the unlawful use of his property." (emphasis added)).

For these reasons, "[a]s the Government would have us construe it, the statute would be open to constitutional doubt in light of a [long] series of cases."[8] Jones v. United States, 526 U.S. 227, 240 (1999). "Any doubt on the issue of statutory construction is hence to be resolved in favor of avoiding" the serious constitutional questions posed by CBP's interpretation of § 1584(a)(2). Id. at 251.

## B.    Congressional Intent

To determine whether CBP's interpretation of § 1584(a)(2) is the only reasonable one, "we must first identify the affirmative intention of the Congress clearly expressed." Catholic Bishop, 440 U.S. at 501 (internal quotation marks omitted). Unless Congress affirmatively intended to legislate at or beyond constitutional limits by compelling CBP's interpretation of the statute, constitutional avoidance requires us to reject CBP's interpretation. See, e.g., id. at 504. The government points to no such "affirmative intention," and traditional tools of statutory interpretation reveal none. We therefore reject CBP's interpretation.

---

[8]Because CBP's interpretation raises serious constitutional questions under the Fifth Amendment, we see no reason to consider whether UP's alternative Eighth Amendment argument would independently trigger the rule of constitutional avoidance in this case.

### 1.    Statute

As always, our "starting point in discerning congressional intent is the existing statutory text." Lamie v. U.S. Tr., 540 U.S. 526, 534 (2004).  The relevant portion of the statute at issue provides:

> If any of such merchandise so found consists of . . . cocaine, . . . the . . . *person in charge* of such vehicle or the *owner* of such . . . vehicle . . . shall be liable to a penalty of $1,000 for each ounce thereof so found. If any of such merchandise so found consists of . . . marihuana, the . . . *person in charge* of such vehicle or the *owner* of such . . . vehicle . . . shall be liable to a penalty of $500 for each ounce thereof so found. . . . except that the . . . *owner* of a vessel used by any person as a common carrier in the transaction of business as such common carrier shall not be liable to such penalties . . . , if it appears to the satisfaction of the court that neither the master nor any of the officers (including licensed and unlicensed officers and petty officers) nor the owner of the vessel knew, and could not, by the exercise of the *highest degree of care and diligence*, have known, that such narcotic drugs were on board.

19 U.S.C. § 1584(a)(2) (emphasis added).

The term "such merchandise" means "any merchandise, including sea stores, . . . found on board of or after having been unladen from" "any vessel [or] vehicle bound to the United States" "which is not included or described in [the] manifest or does not agree therewith." Id. § 1584(a)(1) (emphasis added).  The manifest must be "produce[d]" by the "person in charge of [the] vehicle . . . to the officer (whether of the Customs Service or the Coast Guard) demanding the same." Id.  In this case, the pivotal statutory phrases are "person in charge," "owner," and "highest degree of care and diligence."

### 2.    Person in Charge

Why, according to the government, was UP "in charge" of trains UP did not control?  Because UP forwarded electronic manifest information to CBP.  Why,

according to the government, did UP forward this information to CBP?  Because UP was the "person in charge."  This circular argument does not persuade us.

Although § 1584 does not define "person in charge," the rest of the Tariff Act gives conclusive clues as to the phrase's meaning.  Notably, § 1594 explains "[t]he term 'master' and similar terms relating to the *person in charge* of a conveyance includes the purser or other person *on the conveyance* who is responsible for maintaining records relating to the cargo transported in the conveyance."  19 U.S.C. § 1594(d)(2) (emphasis added).  Twice, § 1594 refers to "the master, pilot, conductor, driver, or *other* person in charge."  Id. § 1594(a)(2), (b)(1) (emphasis added).  By referring to the person in charge as someone "on the conveyance" and associating "person in charge" with "the master, pilot, conductor, [and] driver," the Tariff Act makes clear that the person in charge must be someone capable of exercising *control*.  See, e.g., United States v. Williams, 553 U.S. 285, 294 (2008) ("[T]he commonsense canon of *noscitur a sociis* . . . counsels that a word is given more precise content by the neighboring words with which it is associated.").  It is undisputed UP did not control the trains until after CBP completed its inspection.

The Tariff Act's use of "person in charge" is consistent with the term's ordinary meaning.  To be "in charge" means to "hav[e] *control* or *custody* of something."  Webster's Third New International Dictionary 377 (1993).  Until the trains reached the border, the Mexican railroads *controlled* them; once the trains reached the border, CBP itself took control and *custody* of them.  UP would receive neither control nor custody of the trains until after CBP completed its inspection.[9]

_____

[9]The government's argument that UP became the "person in charge" by forwarding electronic data from the Mexican railroads to CBP runs out of steam.  At most, UP was acting as an agent for the Mexican railroads because CBP refused to accept electronic data directly from the Mexican railroads.  Without any capacity to verify the information, UP automatically forwarded the information to CBP, as authorized by statute.  See 19 U.S.C. § 1431(b).  Merely forwarding this information

-17-

Our plain reading of "person in charge" is also consistent with the term's common law usage. At common law, a "person in charge" meant someone in active control or command of a conveyance. See, e.g., Cont'l Improvement Co. v. Stead, 95 U.S. 161, 163 (1877) (referring to those responsible for "slacken[ing] their speed and sound[ing] the whistle and ring[ing] the bell" as the "persons in charge of the train"); The Suffolk Cnty., 76 U.S. 651, 653 (1869) (referring to those in command of a ferryboat as "the persons in charge"); The Corsica, 76 U.S. 630, 633 (1869) (referring to those who "ordered [the ship's] helm hard a-starboard" as "the persons in charge").

Based upon the undisputed facts presented, UP was not the "person in charge" of any of the thirty-eight trains at issue in this case.

### 3. Owner

Because UP was not "in charge" of the trains, CBP only is on track if UP was the "owner" of each particular "vehicle" containing unmanifested drugs. 19 U.S.C. § 1584(a)(2). Assuming "vehicle" includes an individual railcar—a point the parties vigorously contest but which we need not decide—the bulk of these penalties are still unlawful because UP did not own the majority of the railcars at issue.

At most, UP owned eleven railcars, leaving at least twenty-seven instances in which CBP fined UP for drugs found on railcars UP did not own. CBP's penalties against UP for drugs found on these non-owned railcars are unambiguously beyond CBP's authority under § 1584(a)(2). The government all but concedes this point in its reply brief: "[O]wn[ing] . . . a railcar in which illegal drugs are found brings [UP] squarely within the terms of the statute, *at least as to those railcars*." As to "those railcars" *not* owned by UP, CBP violated § 1584(a)(2), which only authorizes CBP

---

did not make UP the "person in charge" of the trains. The statute plainly authorizes CBP to penalize only the "person in charge," not agents or business associates of the "person in charge."

-18-

to penalize (1) the "person in charge," (2) "the owner," "or" (3) "any person directly or indirectly responsible" for the presence of unmanifested drugs.[10] "It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" Lamie, 540 U.S. at 534 (2004) (quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000)). The language here is plain: transgressing unambiguous statutory limits on its authority, CBP penalized UP for drugs found on railcars not owned by UP.

### 4.    Highest Degree of Care and Diligence

Regardless of UP's ownership of individual railcars, the heart of CBP's potential constitutional problem is the agency's definition of "highest degree of care and diligence." "Despite this constitutional problem, if Congress has made its intent in the statute clear, we must give effect to that intent." Zadvydas v. Davis, 533 U.S. 678, 696 (2001) (internal quotation marks omitted) (quoting Miller v. French, 530 U.S. 327, 336 (2000)). "[H]ere, however," we see no "clear indication of congressional intent," id. at 697, for "highest degree of care and diligence" to be an impossibly high standard—one which would force UP to place its employees or contractors in the crosshairs of Mexico's violent drug cartels and require UP to achieve what the Mexican police and military cannot.

### a.    CBP's Unreasonable Interpretation

Congress expressly directed the relevant agency to promulgate regulations, pursuant to formal notice and comment procedures, defining "highest degree of care and diligence." See § 7369, 102 Stat. at 448. Nothing in that express directive betrays any intention, much less one clearly expressed, to authorize CBP "to interpret [the] statute to push the limit of congressional authority," Solid Waste, 531 U.S. at

---

[10]CBP does not advance the untenable argument that UP was "directly or indirectly responsible" for the Mexican cartels' drug smuggling.

172-73.  Neither can the government plausibly argue Congress unambiguously authorized CBP to stretch constitutional limits, for Congress considered the term ambiguous enough to require further interpretation.  There is "nothing approaching a clear statement from Congress that it intended" CBP's implausible ad hoc interpretation.  Id. at 174.

CBP's contention that exercising the "highest degree of care and diligence" would require UP to achieve something the Mexican police and armed forces cannot is so untenable that it cannot be "based on a permissible construction of the statute," Chevron, 467 U.S. at 843.  CBP fails to show its unreasonable expectation is based on any "specialized experience" or "broad[] investigations and information," Skidmore, 323 U.S. at 139-40.  Instead, CBP relies on a seventy-six year old, two-page district court order which said—with little analysis and no citation to authority—that exercising "the highest degree of care and diligence" means "le[aving] no stone unturned."  Lancashire Shipping Co. v. United States, 17 F. Supp. 573, 574 (S.D.N.Y. 1936). CBP also cites another district court case, ARCA Airlines, Ltda. v. USCS, 726 F. Supp. 827 (S.D. Fla. 1989),[11] but the judge in that case relied, without reasoning, solely on Lancashire's cursory definition of "highest degree of care and diligence," see id. at 831.

Even if these cases were persuasive—and cursory sentences unsupported by legal authority are unlikely to persuade us—neither case supports CBP's impossibly high standard.  Lancashire involved opium found aboard a ship that had sailed from Indonesia to five other Asian ports and then to New York.  See Lancashire, 17 F.

_____

[11]The government informs us the Eleventh Circuit affirmed this district court order.  What the government fails to reveal is that this affirmance was an unpublished, one-*word* opinion, not even binding on the court that issued it.  See ARCA Airlines v. USCS, 945 F.2d 413 (11th Cir. 1991) (unpub. table disp.) ("Affirmed."); see also 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent.").

Supp. at 573-74. During this lengthy voyage, the ship was under the control of its owner, whose officers "might have made as careful a search" as the "customs officers [who] turned up the opium." Id. at 574. ARCA Airlines is no different: in that case, the owner of aircraft flying from Colombia to the United States "failed to take *any* measures to detect contraband," even though the aircraft were under the owner's control before reaching the U.S. border. ARCA Airlines, 726 F. Supp. at 831 (emphasis added).

Nothing in Lancashire or ARCA Airlines supports the notion that an innocent owner is liable for criminality[12] perpetrated by a stranger against the owner's property in circumstances where the property owner can do nothing to prevent the crime because the owner lacks control over the property. These cases certainly do not support the proposition UP is liable for failing to "ma[k]e as careful a search" as the "customs officers [who] turned up the [illegal drugs]," Lancashire, 17 F. Supp. at 574, when UP had no ability to do so—in no small part because CBP will not allow UP to search trains at the border until CBP inspects the trains. Cf. Austin, 509 U.S. at 615-16.

### b.       Reasonable Interpretation

Until CBP ends its ongoing violation of § 7369, 102 Stat. at 448, by adopting, through formal rulemaking, a constitutionally sound interpretation of "highest degree of care and diligence," there is only one reasonable interpretation open to us: the phrase's well-established common law meaning. Contrary to CBP's repeated pronouncements, the common law definition has nothing to do with overturning stones. Cf. Lancashire, 17 F. Supp. at 574. The common law meaning comes not from an unpersuasive, colorful district court order but from authoritative Supreme Court opinions explaining that "the highest degree of care and diligence" is nothing

---

[12]We need not delve into the nuances of Mexican law to recognize that vandalizing a railcar in order to hide illegal drugs inside is criminal conduct.

more than the normal, elevated standard of care expected of any common carrier. See, e.g., N.Y. Cent. R.R. Co. v. Lockwood, 84 U.S. (17 Wall.) 357, 377-78 (1873) ("In regulating the public establishment of common carriers, the great object of the law was to secure the utmost care and diligence in the performance of their important duties—an object essential to the welfare of every civilized community."); Phila. & Reading R.R. Co. v. Derby, 55 U.S. (2 How.) 468, 486 (1852).[13]

Of particular relevance to this case, the Supreme Court explained in Horst that the phrase "highest degree of care and diligence"

> do[es] *not* mean all the care and diligence the human mind can conceive of, nor such as will render the transportation free from any possible peril, nor such as would drive the carrier from his business. It does not, for instance, require, with respect to either passenger or freight trains, steel rails and iron or granite cross-ties, because such ties are less liable to decay, and hence safer than those of wood; nor upon freight-trains air-brakes, bell-pulls, and a brakesman upon every car; but it does emphatically require every thing necessary to the security of the passenger upon either, and *reasonably consistent with the business of the carrier, and the means of conveyance employed.*

Horst, 93 U.S. at 296-97 (emphasis added). By demanding that UP achieve what the Mexican military has been unable to accomplish—prevent murderous drug cartels

---

[13]The government pursues a disingenuous claim that "'the *highest* degree of care' sets the bar higher than 'the degree of care a reasonable *common carrier* would exercise under the circumstances,'" and then cites only cases distinguishing between "the highest degree of care" and "the degree of care that an ordinary, reasonable *person* would exercise in similar circumstances." (Second and third emphases added) (citing Martinez v. Union Pac. R.R. Co., 82 F.3d 223, 228 (8th Cir. 1996); Peyton v. St. Louis S.W. Ry. Co., 962 F.2d 832, 834 (8th Cir. 1992)). Of course, the common law highest degree of care, which is simply the care expected of a reasonable *common carrier*, is higher than the degree of care expected of a reasonable *person*. See, e.g., Indianapolis & St. Louis R.R. Co. v. Horst, 93 U.S. 291, 296-97 (1876).

from hiding illegal drugs in Mexican trains—CBP is holding UP to an unachievable standard expressly rejected by the Supreme Court: "*all* the care and diligence" CBP "can conceive of," rather than the care and diligence which are reasonable. Id. (emphasis added). The government has a single refrain: UP must do "more." But the common law standard requires no *more* than the reasonableness of a common carrier. See, e.g., Austin, 509 U.S. at 616; Horst, 93 U.S. at 297.

UP has done everything "reasonably consistent with [its] business . . . and the means of the conveyance employed" to prevent drug smuggling on the U.S. side of the border. Horst, 93 U.S. at 297. UP has hired its own police force, constructed buildings for CBP's use, and even found drugs CBP missed. The decisive point for this case is that the common law requirement of care and diligence applies to the common carrier *in control*. UP did not control the Mexican rails, whether built upon "wood" or "granite cross-ties," on which the trains rolled to the U.S. border. Id. Neither could UP put "a brakesman"—or a guard with a machine gun—"upon every car" until after the trains reached the United States and CBP completed its inspection. Id. Under the common law standard, UP actually did more than enough on the trains it did not control inside a country in which it has no operations: UP pressured Ferromex to ensure each U.S.-bound railcar, UP owned or not, is searched at least twice by the Mexican military. CBP cannot reasonably expect private personnel hired by UP to outperform the Mexican military in what amounts to a warzone,[14] even if the statute authorized CBP to force UP to secure individual railcars pulled by foreign locomotives.

---

[14]See, e.g., June S. Beittel, Cong. Research Serv., R41576, Mexico's Drug Trafficking Organizations: Source and Scope of the Violence 1 (2013) ("Mexico's brutal drug trafficking-related violence has been dramatically punctuated by more than 1,300 beheadings, public hanging of corpses, killing of innocent bystanders, car bombs, torture, and assassination of numerous journalists and government officials.").

Finding no statutory or logical reason to accept CBP's interpretation of § 1584(a)(2), we "decline to construe the [statute] in a manner that could in turn call upon [us] to resolve difficult and sensitive questions arising out of the guarantees of the" Fifth Amendment Due Process Clause. Catholic Bishop, 440 U.S. at 507. Consistent with the hallowed rules of constitutional avoidance, we choose to avoid these "difficult and sensitive questions" by interpreting the phrase "highest degree of care and diligence" in accordance with its well-established common law meaning. We therefore conclude all of the CBP penalties assessed against UP are "not in accordance with law" and "in excess of statutory . . . authority [and] limitations, or short of statutory right." 5 U.S.C. § 706(2).

## C.    Remedies

Because the penalties are "unlawful," they must be "set aside." Id. The district court did not stop with setting aside the penalties, choosing also to enjoin CBP from penalizing UP "until such time as regulations permitting such action are properly promulgated." The government challenges the district court's choice of remedies, maintaining that the district court erred by (1) not "remand[ing] to the agency for further consideration," and (2) tying CBP's "authority under the Tariff Act itself to impose civil penalties" to CBP's promulgation of "regulations interpreting 'the highest degree' standard." Although remand to the agency is not warranted in this case, we must vacate the district court's injunction.

### 1.    Remand to the Agency

Focusing on the district court's alternate finding that CBP's actions were arbitrary and capricious, the government contends "insofar as the district court concluded that [CBP] failed to consider certain issues and to articulate its reasoning adequately, those are precisely the sort of errors that the agency could correct—and is entitled to correct—on remand." (Internal citation omitted). We do not rest our decision on the district court's alternate finding, so the agency is not entitled to try again.

-24-

To be sure, CBP's reasoning is inconsistent, incomplete, and at times even incomprehensible.[15] In one memorandum, CBP wrote "that by *presenting* the manifest, [UP] is responsible for its accuracy." (Emphasis added). However, CBP later wrote "[t]he pertinent question . . . is *not* who was responsible for *presenting* the manifest." (Emphasis added). Then, at argument, the government asserted "the *key, ultimate issue* here is who *presents* the manifest." (Emphasis added).

Equally baffling, within a single memorandum CBP acknowledged UP "did not have the opportunity to inspect the subject railcars prior to [CBP's] inspection," yet declared that UP "has chosen to engage in a high-risk market of carriage . . . *from Mexico* to the United States." (Emphasis added). How could UP, without any operations in Mexico, transport trains "*from* Mexico"? CBP offers no explanation. The truth is UP does not participate in the "high-risk market of carriage . . . from Mexico," but rather participates solely in the market of carriage from CBP inspection facilities on the U.S. side of the border to other points in the United States. Having no operations in Mexico, UP operates entirely within the United States.

But we need not decide whether CBP's actions were arbitrary and capricious under the APA because CBP's actions exceeded its statutory authority under the Tariff Act. An administrative remand may be appropriate when an agency procedurally errs by failing to articulate a reasoned basis for its decision. When an agency legally errs by acting outside its statutory authority, a remand would be futile and improper. We simply will not remand "'[w]here application of the correct legal standard could lead to only one conclusion.'" Zabala v. Astrue, 595 F.3d 402, 409

---

[15]We are reminded of Calvin, America's comic six-year-old, who told his stuffed tiger "the purpose of writing is to inflate weak ideas, obscure poor reasoning, and inhibit clarity. With a little practice, writing can be an intimidating and impenetrable fog." Bill Watterson, Homicidal Psycho Jungle Cat: A Calvin and Hobbes Collection 62 (1994).

(2d Cir. 2010) (alteration in original) (quoting Schall v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998)).

As the government essentially concedes, a holding that CBP lacked statutory authority to penalize UP "lead[s] to only one conclusion":

> [I]f this Court were to uphold the district court's principal holding, that [CBP]'s actions were *ultra vires* in the absence of regulations establishing criteria interpreting "the highest degree" standard in [§] 1584(a)(2), a *remand would serve no purpose*.

(Emphasis added). Although we do not think CBP's actions were unlawful for precisely this reason, we do agree with the district court's conclusion that CBP's actions were *ultra vires*. On remand, "only one conclusion would be supportable." Donovan v. Stafford Constr. Co., 732 F.2d 954, 961 (D.C. Cir. 1984). Giving CBP a chance to polish its writing and patch its reasoning would not make CBP's actions any less constitutionally suspect or any more authorized by statute.

### 2.    Injunction

By contrast, the government's challenge to the district court's improvident injunction makes the grade. Without citation to any authority, the district court opined that CBP's failure to comply with the congressional directive to define "highest degree of care and diligence" through formal rulemaking, see § 7369, 102 Stat. at 448, meant CBP was "not free to unilaterally create its own interpretation of the Tariff Act outside the notice-and-comment procedure [or] . . . to enforce an unauthorized standard against [UP]." On that basis, the district court issued an injunction designed to force CBP to enact formal rules. The district court erred in two ways.

First, unless Congress "specif[ies] a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose

their own coercive sanction." United States v. James Daniel Good Real Prop., 510 U.S. 43, 63 (1993). Congress commanded the agency to promulgate formal rules, see § 7369, 102 Stat. at 448, but Congress did not "specify a consequence for noncompliance," James Daniel Good, 510 U.S. at 63. In accordance with a "'great principle of public policy,'" we do not allow "'public interests [to] be prejudiced by the negligence of the officers or agents to whose care they are confided.'" Brock v. Pierce Cnty., 476 U.S. 253, 260 (1986) (quoting United States v. Nashville, C. & St. L. Ry. Co., 118 U.S. 120, 125 (1886)). Whether the agency's blatant and ongoing noncompliance, see § 7369, 102 Stat. at 448, is due to negligence, bureaucratic incompetence, strategic avoidance, or something more nefarious, we will not graft onto the statute a penalty Congress did not create. And we will not order CBP to comply with § 7369, 102 Stat. at 408, because UP never requested that remedy.

Second, CBP's actions in this case are unlawful not because CBP failed to comply with § 7369, 102 Stat. at 448, but because CBP exceeded its statutory authority under 19 U.S.C. § 1584(a)(2). No regulation CBP could "properly promulgate" would authorize CBP to penalize UP for illegal drugs found on railcars UP neither owns nor controls because the statute does not authorize such penalties.

As to any UP owned railcars, CBP should be free in the future to comply with § 7369, 102 Stat. at 448, by developing a reasonable and constitutionally sound definition of "highest degree of care and diligence" or, if CBP wishes to continue ignoring Congress's express directive, CBP may apply the established common law definition.[16]

---

[16]As our earlier discussion makes clear, the common law standard, to the extent it applies to railcars, will not permit CBP to penalize UP for drugs found on UP owned railcars under the Mexican railroads' control unless UP is negligent in entrusting its railcars to the control of the Mexican railroads (a position the government has not taken in this case). See, e.g., Austin, 509 U.S. at 615-16; Peisch, 8 U.S. (4 Cranch) at 364-65.

In this case we have accepted, without ruling upon, the parties' tacit agreement that (1) the "highest degree" exception applies not just to "vessel[s]" but also to "vehicle[s,]" and (2) CBP, rather than "the court," decides the exception's applicability in the first instance. 19 U.S.C. § 1584(a)(2) (exempting from penalty "the master or owner of a *vessel* used by any person as a common carrier . . . if it appears to the satisfaction of the *court* that neither the master nor any of the officers . . . nor the owner of the *vessel* knew, and could not, by the exercise of the highest degree of care and diligence, have known, that [illegal] drugs were on board" (emphasis added)). Nor have we decided whether the term "vehicle," as used in § 1584(a)(2), encompasses an individual railcar which has no means of self-propulsion. For these reasons, and on this record, today is not the time to enjoin CBP from penalizing UP in the future for drugs found on UP owned railcars.

We vacate the district court's erroneous injunction and direct the district court to enjoin CBP only from penalizing UP for illegal drugs found on railcars that UP neither controls nor owns.

## III.  CONCLUSION

We affirm in part, vacate the injunction, and remand with instructions to issue a corrected injunction consistent with this opinion.

_____